Myron Vanderhule et al., Appellants, *v.* Harry L. Berinstein et al., Doing Business as State Bowling Center, et al., Respondents.

Third Department, December 16, 1954.

*Robert E. Fischer* for appellants.

*James B. Gitlitz* for respondents.

HALPERN, J. The plaintiffs appeal from an order, setting aside a verdict in their favor and dismissing the complaint in an action to recover damages for an assault committed by an employee of the defendants, and from the judgment entered pursuant to the order.

The first four defendants named in the title are copartners owning and operating a bowling alley in the city of Binghamton, New York, known as the State Bowling Center. The defendant Randall is the general manager of the Bowling Center. The Bowling Center has twenty bowling alleys at which 200 people bowl in an evening in two shifts. Immediately adjacent to the alleys, there are benches upon which the bowlers sit between games. Behind the benches are several rows of seats for spectators. In an adjoining room, there is a luncheonette where food and beer are served.

Overlooking the bowling alleys is a desk at which a supervisory employee known as a '' desk man '' is stationed. He

collects the money from the team captains and designates the alleys at which the teams are to bowl. He also makes announcements over the public address system, and generally is in charge of the Bowling Center when the manager is not present. The desk man serves as the assistant manager and is sometimes referred to by that title.

On September 20, 1952, three weeks before the occurrence of the assault which gave rise to this action, a man named Finkle applied to the defendant Randall for a job. He had just come to the city and had no permanent place of residence and he had no funds. Randall admitted that Finkle had all the characteristics of a '' floater '' except that he was '' a little bit better dressed than a floater ''.

Finkle did not have any letter of reference from any former employer; in fact, he evaded the question and did not give the name of any former employer when Randall asked him about it. Randall made no other inquiries except a request for Finkle's social security number. Finkle was hired as a pin setter. After being so employed for a week, he was promoted to desk man and assistant manager, next in command to Randall, the general manager. No inquiry was made as to his history or background prior to his promotion to desk man and assistant manager. There was some evidence that during the period of his employment, Finkle had told a fellow employee that he had '' had trouble with the police agencies in Albany '' and that this information had been reported to the general manager.

Randall had rented a room in his own apartment to Finkle and, on October 12, 1952, while they were riding home together, Finkle made some statements, which were obviously irrational or confused, to the effect that '' the Democrat organization '' was '' holding his wife in Albany '' and '' wouldn't let him get to see her ''. Randall heard this statement but '' took it as a joke ''; he did not pursue the matter with Finkle and he made no further inquiry of anyone.

The next evening, October 13, 1952, the plaintiffs, Mr. and Mrs. Vanderhule, went to the Bowling Center shortly before nine o'clock for a game in a league in which Mr. Vanderhule was a member. Upon their arrival, Finkle was acting as the desk man, during the first series of games. During the second series, he was replaced by another man at the desk and Finkle temporarily served as a pin setter, because of an emergency which had arisen due to the absence of one of the pin boys. About half past ten o'clock, while Mrs. Vanderhule was keeping score for her husband's team, Finkle approached her and struck

her in the face, without any provocation and without any apparent reason. She had seen Finkle the week before when she had been at the Bowling Center, bowling on a girls' team, but there was no evidence of the occurrence of any altercation that night or of any other incident which might account for the assault. When Mr. Vanderhule observed the assault upon his wife, he engaged in a tussle with Finkle and in the course of it, he fell and fractured his knee.

The defendant Randall was in his office at the time. When he was told of the assault, his immediate response was that Finkle "must have gone off his rocker".

Subsequently, Finkle was confined to the Binghamton State Hospital and was not available upon the trial as a witness for either side.

An action was brought for the assault upon the wife and for the injury suffered by the husband. The complaint alleged several causes of action, two principal grounds of recovery being advanced. One was that the defendants knew or, in the exercise of care, should have known of Finkle's "paranoid and psychopathic tendencies" and that the defendants were negligent in employing and retaining him. The other ground of recovery was that the defendants, in consideration of a fee paid them, "promised and agreed to treat plaintiffs properly and carefully and to protect them at all times while they were at said State Bowling Center", and that the defendants had breached the agreement.

The trial court dismissed the so-called contract cause of action at the close of the case but submitted the negligence cause of action to the jury. The jury reported a verdict in favor of the plaintiffs. The court thereafter set the verdict aside and granted the motion made by the defendants at the close of the case to dismiss the complaint. The dismissal was based upon the ground that the plaintiffs had failed to establish that the negligence of the defendants was the proximate cause of the plaintiffs' injuries. The court reasoned that the defendants were under a duty to make inquiry before hiring an employee and that they had breached that duty in employing Finkle without any "inquiry or investigation as to his character or past", but that this negligence was not the proximate cause of the injury because there was no proof of "any fact concerning Finkle or his past, which any inquiry, however extensive and thorough, would have disclosed indicating that his employment would be a potential danger to others".

A more conventional way of expressing the trial court's conclusion would be to say that the defendants had not been guilty of any negligence. The trial court conceived of the defendants' duty as a duty in the abstract to make inquiry but that is not a duty for the breach of which an action could be maintained. " ' Proof of negligence in the air, so to speak, will not do ' " (*Palsgraf* v. *Long Island R. R. Co.*, 248 N. Y. 339, 341). The ultimate duty of the defendants, for a breach of which the defendants could be held liable, was the duty to refrain from hiring or retaining anyone whom they knew or, in the exercise of reasonable care, they should have known was potentially dangerous. If, as the court concluded, there was no evidence which warranted the inference that the defendants knew or should have known that Finkle was potentially dangerous, there was no negligence on their part in selecting and retaining Finkle as an employee. The question of proximate cause would arise only if it were found that the defendants had been guilty of negligence in retaining Finkle and the question would then be whether the negligence was causally connected with the assault. On that issue there could be little doubt. The risk of assault upon a patron was well within the range of the foreseeable consequences of retaining a potentially dangerous employee.

The troublesome question here is not the question of proximate cause but of negligence. Partly because of the reliance of the plaintiffs' counsel upon incompetent methods of proving the character and prior conduct of Finkle, to which reference is made below, evidence of negligence at the conclusion of the case was very thin. However for the purpose of determining whether a sufficient case had been made out for submission to the jury, the plaintiffs were entitled, under the elementary rule, to that view of the evidence which was most favorable to their claim. " The question of negligence is for a jury when there is a conflict in the evidence or when, though there is no such conflict, fair-minded men can draw more than one inference from the undisputed facts (*Mead* v. *Parker,* 111 N. Y. 259, 262; *Salt Springs Nat. Bank* v. *Sloan,* 135 N. Y. 371, 384). In our judgment, fair-minded jurors could here reasonably have inferred from the undisputed facts a failure of the defendant to exercise * * * the due care and caution that were required " (*Veihelmann* v. *Manufacturers Safe Deposit Co.,* 303 N. Y. 526, 530).

Looking at the evidence, which we have summarized above, in the light most favorable to the plaintiffs, we think there was sufficient evidence to make the question of the defendants'

negligence a question of fact for the jury. The irrational remarks by Finkle the evening before the assault, coupled with the peculiar circumstances under which he had been employed and promoted, permitted a finding by fair-minded jurors that the general manager should have realized that Finkle was mentally unstable and that it was dangerous to retain him. Furthermore, even if the circumstances were not sufficient of themselves to charge the defendants with notice of Finkle's condition, they were sufficient, when combined with the further fact that Finkle was confined to a mental institution shortly after the assault, to warrant a finding by a jury that, if diligent inquiry had been made before the assault, a history of prior mental instability would have been uncovered.

We therefore cannot accept the trial court's conclusion that the defendants were free from negligence as a matter of law (cf. *McCrink* v. *City of New York,* 296 N. Y. 99, and *Fleming* v. *Bronfin,* 80 A. 2d 915).

However, we are of the opinion that the verdict in favor of the plaintiffs was against the weight of the evidence. The distinction between a case insufficient in law and a case not supported by the weight of the evidence is a well-settled one and we believe that this is an appropriate case in which to apply the distinction (see Civ. Prac. Act, § 457-a; Fifteenth Annual Report of N. Y. Judicial Council, 1949, p. 241). We therefore sustain so much of the order as sets the verdict aside but we modify the order by granting a new trial instead of dismissing the complaint.

As has been noted above, the plaintiffs sought to prove prior assaults by Finkle by introducing into evidence a memorandum made by a police officer purporting to contain an admission by Finkle that " he had been arrested in Albany in 1950 for the same thing ". Any admission by Finkle, even if proved by the testimony of the police officer to whom he had made it, was not admissible in evidence against the defendants. In any event, the memorandum of the alleged conversation was not admissible under section 374-a of the Civil Practice Act as a record made in the regular course of business (*Johnson* v. *Lutz,* 253 N. Y. 124). The trial court correctly excluded this proof. It also correctly excluded the records of the Binghamton State Hospital containing statements by Finkle as to his prior history, which the plaintiffs offered to show prior irrational conduct. This proof was inadmissible both upon the ground that the statements were privileged communications and upon the ground that they were not made in the regular course of business (Civ.

Prac. Act, §§ 352, 374-a; *Matter of Warrington [State of New York]*, 303 N. Y. 129; *Matter of Coddington*, 307 N. Y. 181).

As we have indicated, even without this proof, we believe that there was sufficient evidence to warrant submission of the case to the jury but we point out that the case is so thin that a resubmission of the case upon the same proof may well result in requiring the court again to set aside any verdict in favor of the plaintiffs. The lines of inquiry suggested by the excluded proof should therefore be fully explored prior to the new trial.

We believe that the dismissal by the trial court of the so-called contract cause of action was proper. The plaintiffs' counsel relies principally upon the common carrier cases as precedents for his theory. In the common carrier cases, it has been held that the carrier is liable for an assault upon a passenger committed by a servant of the carrier, who was charged with providing for the safety and comfort of the passenger, even though the servant stepped outside the scope of his employment in committing the assault (*Stewart* v. *Brooklyn & Crosstown R. R. Co.*, 90 N. Y. 588; *Dwinelle* v. *New York Central & Hudson R. R. Co.*, 120 N. Y. 117; *Gillespie* v. *Brooklyn Heights R. R. Co.*, 178 N. Y. 347; Restatement, Agency, § 214, comment d; Prosser on Torts, p. 480). The plaintiffs urge that this rule should be extended to all places of public accommodation and resort.

We do not believe that such an extension of the rule is properly within the province of the courts. Whether the rule evolved in the common carrier cases should be extended to all places of public accommodation and resort is a question which should be resolved by the Legislature, where an adequate opportunity can be afforded for an exploration of the interests affected and a weighing of the social benefits against the commercial burdens of the proposed rule.

Recognizing the need for legislative support for his position, plaintiffs' counsel invokes section 40 of the Civil Rights Law which lists bowling alleys among the business enterprises which are classified as places of public accommodation and resort. The relevance of this statute is slight, if indeed it has any relevance at all. Section 40 of the Civil Rights Law is primarily an antidiscrimination statute; it does not purport to deal with the scope or nature of the liability of the owner of the business for injuries sustained by patrons. Under this section of the Civil Rights Law, the owners of the enumerated business enterprises are forbidden to discriminate in their patronage on the ground of race, color, creed or national origin but they are not forbidden to refuse to serve a prospective patron on any personal ground

not coming within the grounds condemned by the statute (*Woollcott* v. *Shubert,* 217 N. Y. 212; *Madden* v. *Queens Co. Jockey Club,* 296 N. Y. 249). On the other hand, a common carrier is required to serve all who apply, within the limits of his facilities. It is thus apparent that even with respect to the obligation to serve all, section 40 of the Civil Rights Law does not place the owners of the businesses therein listed in the same status as common carriers.

In any event, the rule laid down in the common carrier cases imposing absolute liability for assaults by employees does not rest upon the duty of nondiscrimination in the selection of patrons or even upon the special common-law obligation to accept all patrons. It rests rather upon a finding that a common carrier is subject to a special and peculiar duty of protection because of the fact that the passenger entrusts his safety and well-being to the custody and control of the carrier, with very little ability on the passenger's part to control the risks involved in his transportation.

While it is true that the owner of a place of public accommodation and resort owes a duty of protection to his patrons, it is a duty which is different in degree, if not in kind, from the duty resting upon a common carrier. The patron is not completely subjected to the control of the owner of the enterprise in the same manner in which a passenger is subjected to the control of a common carrier.

Furthermore, even if similarities may be found, they are not sufficient to warrant a judicial extension of the common carrier rule. The rule originated in the early days of the railroads when travel was considered by many to be a dangerous adventure. The rule has been walled off from the rest of the law and has not been allowed to serve as a basis for reasoning by analogy in the solution of cases involving other business enterprises (see *Castorina* v. *Rosen,* 290 N. Y. 445, discussed *infra*).

There are dicta in some of the cases in this State which loosely refer to the patrons of places of public accommodation and resort as occupying a status similar to that of passengers of a common carrier but upon analysis it will be found that they do not support the extension of the rule of absolute liability for which the plaintiffs here contend. Thus it was said in *Aaron* v. *Ward* (203 N. Y. 351, 357) that the status of a patron of a place of public accommodation and resort was " similar to that of a passenger of a common carrier or guest of an innkeeper " but that case did not involve any question of the liability of the owner of the establishment for an act of an employee outside

the scope of his employment. The defendant in that case, the owner of a public bathhouse, was held liable for the indignity and humiliation suffered by the plaintiff as a result of the rude and insulting manner in which the defendant's employees had ejected her from the premises. Even though the act of the defendant's employees was an improper one, committed through bad judgment or excessive zeal on their part, it was still an act within the scope of their employment. In the present case, the plaintiffs disavow any claim that Finkle was acting within the scope of his employment when he assaulted the plaintiff.

*Aaron* v. *Ward* (*supra*), has been cited in subsequent cases as extending the rule of absolute liability for assault, laid down in the common carrier cases, to the owners of bathhouses (*Stone* v. *Eisen Co.*, 219 N. Y. 205; *Trebitsch* v. *Goelet Leasing Co.*, 226 App. Div. 567, affd. 252 N. Y. 554) but, as has been seen, these dicta go far beyond the actual holding in the *Aaron* case.

There are broad statements in decisions in other States purporting to lay down a rule of absolute liability for assault by employees, with respect to places of public accommodation and resort, but it will be found that in most of the cases the act of the employee for which the employer was held liable was within the general scope of his employment (see e.g. *Dickson* v. *Waldron*, 135 Ind. 507; and see the cases collected in note 34 A. L. R. 2d 372).

In this State, whatever the situation may have been theretofore, the door was closed to a judicial extension of the common carrier rule (at least by the lower courts), by the decision of the Court of Appeals in 1943 in *Castorina* v. *Rosen* (290 N. Y. 445, *supra*). In that case, the plaintiff had left his car for safekeeping in a public garage operated by the defendants. During the night the automobile was stolen by an employee of the defendants, who had been employed to wash cars and to watch the premises. The court held that, in the absence of a showing of negligence on the part of the defendants in hiring or retaining the employee, the defendants were not liable for his misconduct, outside the scope of his employment. The trial court had held that " The rule under which common carriers are liable for the torts of their employees should be extended to garage owners, in cases where the loss of or damage to automobile is involved " (quoted in 265 App. Div. 316, at p. 317). This was rejected by the Court of Appeals, the court explicitly stating " Cases involving common carriers * * * are not in point ". While the court recognized that there were cases in other States holding that the garageman rather than the cus-

tomer should " stand such a loss as this " (p. 447), the court held that, under the settled New York law, there was no liability on the part of the garageman. The Appellate Division had also rejected the common carrier analogy but it had invoked a general theory of absolute liability, holding that where one of two innocent persons had to suffer a loss, the one who was in the better position to prevent it should bear it, but this line of reasoning was expressly rejected by the Court of Appeals. Incidentally, in connection with the argument of the plaintiffs resting upon section 40 of the Civil Rights Law, it may be noted that a public garage is listed as a place of public accommodation for the purpose of the antidiscrimination statute, but that fact was not mentioned in the opinion of the Court of Appeals as having any relevance. While the *Castorina* case dealt with loss of property rather than personal injury, the principle is plainly applicable to personal injury cases also and is decisive here.

The judgment appealed from should be reversed, on the law and the facts, and the order setting aside the verdict of the jury should be modified, on the law and the facts, by eliminating the provision for the dismissal of the complaint and by substituting therefor a direction that a new trial be ordered and, as so modified, the order should be affirmed, on the law and the facts, with costs to abide the event.

BERGAN, J. P., COON, IMRIE and ZELLER, JJ., concur.

Judgment appealed from reversed, on the law and the facts, and the order setting aside the verdict of the jury is modified by eliminating the provision for the dismissal of the complaint and by substituting therefor a direction that a new trial be ordered, and, as so modified, the order is affirmed, on the law and facts, with costs to abide the event. [See 284 App. Div. 1089.]