JOSEPH EVANS *v.* JAMES ROBERT MORSELL
T/A FAIRFIELD LIQUORS

[No. 166, September Term, 1977.]
*Decided December 19, 1978.*

*Morris Mazelis* for appellant.

*Robert K. Nead* for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

We issued a writ of certiorari in this case in order to consider the principles applicable to an action against an employer based upon the alleged negligent hiring or retention of an employee.

The plaintiff Joseph Evans brought this action for compensatory and punitive damages for personal injuries which he sustained as a result of being shot by a bartender in a tavern owned by the defendant. The plaintiff alleged in his declaration that he entered the defendant's establishment "as a customer and invitee," that he was acting in a peaceful manner when he was "maliciously shot with a twelve gauge shotgun" by the bartender, Jessie Hopkins, and that the defendant "knew or should have known of the vicious propensities" of his employee Hopkins because of the latter's "past record of criminal assaults." The plaintiff went on to assert that the defendant tavern owner breached his duty to the plaintiff, a customer, "by employing a person of the character of Jessie Hopkins, in a sensitive position as that of bartender, and permitting him access to a dangerous weapon." The case was tried before a jury in the Superior Court of Baltimore City, and, at the close of all of the evidence, the trial judge granted the defendant's motion for a directed verdict.

The evidence at the trial was as follows.[1] The plaintiff

---

1. Since the defendant's motion for a directed verdict was granted, to the extent that the evidence was conflicting, we set out the version most favorable to the plaintiff. *See, e.g.,* Quality Discount Tires v. Firestone Tire, 282 Md. 7, 11, 382 A. 2d 867 (1978); Beahm v. Shortall, 279 Md. 321, 341-343, 368 A. 2d 1005 (1977); Levine v. Rendler, 272 Md. 1, 12, 320 A. 2d 258 (1974); Durante v. Braun, 263 Md. 685, 689, 284 A. 2d 241 (1971).

testified that on the evening of April 27, 1973, he entered the defendant's tavern, went to the bar, and asked the bartender Hopkins for some beer. According to plaintiff, he was refused service by the bartender, and later by the defendant owner, on the ground that previously he had allegedly brought beer into the bar from someplace else. After being denied service, the plaintiff talked a while with some other customers and then left the tavern. Later that evening, the plaintiff came back to the tavern and, as he testified:

> "(The Witness) So when I come back in I plucked my fingers to the music and so forth.
>
> "(The Court) You did what?
>
> "(The Witness) I was snapping my fingers to the music. When I look up the bartender is aiming a shotgun at me. So I just stood there. Then he got a wild look in his face so I threw my arm across my head and started spinning and I got hit . . . in my arm and got hit in my stomach . . ., and I ran to the door. When I reached for the door that's when he shot me in my upper thighs and leg."

The plaintiff was able to escape from the tavern, and someone outside took him to a hospital. The bartender Hopkins was later convicted of assault and sentenced to twelve years' imprisonment.

The plaintiff testified that he did nothing to provoke the bartender and that he never had any arguments with him, although Hopkins "had a few words with me the day before." The plaintiff also testified that he was a regular patron of the defendant's tavern and that he had seen Hopkins "drunk and arguing with other customers" on several occasions before this. However, he did not testify to any facts indicating that the owner was present on such occasions or had any knowledge of his employee's arguing with other customers.

The evidence further showed that the defendant had purchased the tavern in November 1972, and had hired Hopkins as a bartender in December 1972. At that time, Hopkins had a significant criminal record, with several convictions for assault — all in the 1950's and 1960's. The

defendant was not aware of this, and made no inquiry of Hopkins concerning a possible criminal record.

Hopkins had worked for the prior owner of the tavern for eighteen months as a bartender. The prior owner testified that Hopkins, although he would occasionally "go on a drunk," never got drunk in the tavern, was a "good worker," was "honest" and had never assaulted anyone or had fights with anyone in the tavern. The former owner of the tavern also testified that when he sold the business to the defendant, the defendant inquired about previous employees, and the witness recommended Hopkins as a good worker and a person whom the defendant should employ. Additionally, the former owner testified that he had been in the tavern business for about ten years, that he had known other tavern owners in the area, and that there was no practice among the owners to inquire concerning the possible criminal records of persons who were applying for positions as bartenders.

The defendant testified that he had been a Baltimore City police officer for seventeen years before leaving the police force and purchasing the tavern in November 1972. While he was a police officer, he had known Mr. Hopkins and never had any difficulty with him. The defendant confirmed that before employing Hopkins, he had inquired of the former owner of the tavern, and the former owner told him that Hopkins was a "good worker." The previous owner did not tell him that he had ever had any difficulty with Hopkins or that Hopkins had ever been involved in an altercation in the bar. Additionally, the defendant testified that between the time that he had hired Hopkins and the shooting on April 27, 1973, he was aware of no fights with customers or any other actions by the bartender that would lead him to believe that such a shooting might take place. The defendant kept the shotgun in a back room directly behind the bar because he kept a large amount of cash on hand for check cashing purposes.

Finally, the records supervisor in the Central Records Division of the Baltimore City Police Department testified that in 1972, if an employer wanted the criminal record of an employee or prospective employee, the employer could not get it himself, but he could require the employee or prospective

employee to obtain it. If he did, the Police Department would furnish the employee or prospective employee with a certified copy of his criminal record or a letter stating that he did not have a criminal record.

After the presentation of all of the evidence, during the argument on the motion for a directed verdict, the plaintiff's position was that in the type of business here involved, with regard to a prospective employee who will come into contact with the public, it is incumbent on an employer to inquire concerning the prospective employee's criminal record. The trial judge, rejecting this contention, granted the motion for a directed verdict. From the judgment on the verdict in favor of the defendant for costs, the plaintiff took an appeal. Prior to a hearing in the Court of Special Appeals, we issued a writ of certiorari. The plaintiff argues here, as he did below, that under circumstances such as existed in this case, the defendant breached a duty to the plaintiff by not inquiring about Hopkins's criminal record before hiring the bartender.[2]

Long ago this Court recognized, prior to the enactment of the Workmen's Compensation Act and in the somewhat different context of an employee injured by the alleged negligence of a drunken co-worker, that in hiring and retaining someone, an employer owes a duty to his other employees and to the general public to use reasonable care. Judge McSherry thus stated for the Court in *Norfolk and*

---

2. Both in the trial court and in this Court, the plaintiff's contention has been that the defendant himself was negligent in hiring and retaining the bartender. At no time has the plaintiff suggested that the defendant might be vicariously liable under the doctrine of respondeat superior. Consequently, we do not consider such possibility, and cases dealing with the respondeat superior liability of an employer for the intentional torts of his employee committed in the scope of employment are not here applicable. *See, e.g.,* Lewis v. Accelerated Express, 219 Md. 252, 148 A. 2d 783 (1959); McCrory Stores v. Satchell, 148 Md. 279, 129 A. 348 (1925); Amusement Co. v. Spangler, 143 Md. 98, 121 A. 851 (1923); Steinman v. Laundry Co., 109 Md. 62, 71 A. 517, 21 L.R.A., N.S. 884 (1908); Barabasz v. Kabat, 86 Md. 23, 37 A. 720 (1897); Cate v. Schaum, 51 Md. 299, 308-309 (1879).

Similarly, the plaintiff has not relied upon the doctrine of negligent entrustment with respect to the shotgun, *see, e.g.,* Curley v. General Valet Service, 270 Md. 248, 255, 311 A. 2d 231 (1973), and cases there cited, although plaintiff does point to the presence of the shotgun as one of the circumstances which allegedly imposed the duty on the defendant to inquire about the bartender's criminal record.

*Western Railroad Co. v. Hoover,* 79 Md. 253, 262, 29 A. 994 (1894):

"But he owes to each of his servants the duty of using reasonable care and caution in the selection of competent fellow-servants, and in the retention in his service of none but those who are. If he does not perform this duty, and an injury is occasioned by the negligence of an incompetent or careless servant, the master is responsible to the injured employe, not for the mere negligent act or omission of the incompetent or careless servant, but for his own negligence in not discharging his own duty towards the injured servant. As this negligence of the master must be proved, it may be proved like any other fact, either by direct evidence or by the proof of circumstances from which its existence may, as a conclusion of fact, be fairly and reasonably inferred. That drunkenness on the part of a railroad employe renders him an incompetent servant will scarcely be disputed; nor can it be questioned *that a master who knowingly employs such a servant, or who, knowing his habits, retains him in his service, would be guilty of a reckless and wanton breach of duty, not only to the public, but to every employe in his service.*" (Emphasis supplied.)

The Court went on to point out that there is a rebuttable presumption that an employer uses due care in hiring an employee, and that this presumption may of course be overcome by direct or circumstantial evidence. 79 Md. at 263. The Court also indicated that the employer's failure to make a proper inquiry may under some circumstances constitute negligence itself. *Ibid.*

Similar principles have been applied by the courts in cases like the one at bar, involving intentional torts committed by employees or other agents upon members of the public. A critical standard here is whether the employer knew or should have known that the individual was potentially dangerous. As stated by the Supreme Court of New York, Appellate

Division, in *Vanderhule v. Berinstein,* 285 App. Div. 290, 136 N.Y.S.2d 95, 100 (1954):

> "The ultimate duty of the defendants, for a breach of which the defendants could be held liable, was the duty to refrain from hiring or retaining anyone whom they knew or, in the exercise of reasonable care, they should have known was potentially dangerous."

And as pointed out by the court in *Fleming v. Bronfin,* 80 A. 2d 915, 917 (D.C. 1951):

> "One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment. This principle has been applied in a variety of cases dealing with innkeepers, carriers, stores, apartment houses, and other businesses."

*See McCrink v. City of New York,* 296 N. Y. 99, 71 N.E.2d 419, 422 (1947) (stating that the issue for the jury in such cases is whether the hiring or retention of the employee "involved danger to others reasonably to be foreseen"). *See also, e.g., Kendall v. Gore Properties,* 236 F. 2d 673 (D.C. Cir. 1956); *Henderson v. Nolting First Mortgage Corporation,* 184 Ga. 724, 193 S. E. 347 (1937); *Hall v. Smathers,* 240 N. Y. 486, 148 N. E. 654 (1925); Restatement of Agency 2d, § 213, Comment d; Prosser, *Law of Torts,* pp. 173-176 (4th ed. 1971).[3]

Where an employee is expected to come into contact with the public, which is obviously the situation concerning a

---

3. Although most cases dealing with negligent hiring or retention involved employees, the applicable principles appear to be the same regardless of whether the employer hires an employee or an independent contractor to deal with his customers. Bennett v. T & F Distributing Co., 117 N.J. Super. 439, 285 A. 2d 59 (1971).

bartender, it has been held that the employer must make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee. *Kendall v. Gore Properties, supra,* 236 F. 2d at 677, 678. The nature and extent of the inquiry that is needed will naturally vary with the circumstances. *Id.* at 678.

However, the majority of courts flatly reject the contention of the plaintiff in the present case, namely that where an employee is to regularly deal with the public, an inquiry into a possible criminal record is required. On the contrary, the cases hold if the employer makes adequate inquiry or otherwise has a sufficient basis to rely on the employee, there is no need to inquire about a possible criminal record. *Abraham v. Onorato Garages,* 50 Haw. 628, 633, 446 P. 2d 821 (1968); *Bradley v. Stevens,* 329 Mich. 556, 46 N.W.2d 382, 384-385 (1951); *Stevens v. Lankard,* 31 A.D.2d 602, 297 N.Y.S.2d 686, 688 (1968), *aff'd,* 25 N.Y.2d 640, 254 N.E.2d 339 (1969).[4] *But cf. Hipp v. Hospital Authority of City of Marietta,* 104 Ga. App. 174, 121 S.E.2d 273, 275 (1961).

We agree with the cases holding that an employer ordinarily has no duty to inquire concerning the possible criminal record of a prospective employee. It may today be quite difficult to obtain criminal records. In addition, when one has completed a criminal sentence or has been paroled, the employer to some extent is entitled to rely upon the determination of the government's criminal justice system that the individual is ready to again become an active member of society.[5] Furthermore, it would impose a significant

4. Furthermore, even where the employer knows of a criminal record and still hires the employee, this does not automatically make out a prima facie case of negligent hiring. Instead, it depends upon the nature of the criminal record and the surrounding circumstances. Argonne Apartment House Co. v. Garrison, 42 F. 2d 605, 608 (D.C. 1930) (prior conviction for intoxication did not put employer on notice that employee might be dishonest); Strawder v. Harrall, 251 So. 2d 514, 518 (La. App. 1971) (employer's knowledge that employee was on parole from the penitentiary was not sufficient to render it negligent to hire employee as a service station attendant); Bradley v. Stevens, 329 Mich. 556, 46 N.W.2d 382, 385 (1951) (knowledge by service station owner that employee was convicted of nonsupport was insufficient to put employer on notice that employee might attack female customer).

5. There are limits to this idea, however, depending upon the sensitivity of the position, the nature of the past criminal conduct, and the surrounding circumstances.

burden upon employers, as well as upon unemployed prospective employees, if an employer had to regularly investigate the possible criminal background of applicants for employment. *See Bennett v. T & F Distributing Co.,* 117 N.J. Super. 439, 285 A. 2d 59, 62 (1971); *Stevens v. Lankard, supra,* 297 N.Y.S.2d at 688.

Applying the foregoing principles to the instant case, we agree with the defendant that the motion for a directed verdict was properly granted. There was no evidence whatever that the defendant knew or should have known that the bartender Hopkins was potentially dangerous. The defendant did inquire about Hopkins before employing him, asking the former owner of the tavern who had been Hopkins's employer for eighteen months. The former owner recommended Hopkins to the defendant, telling him that he was a "good worker" and that he would employ him. Moreover, the defendant himself, in his prior capacity as a police officer, knew Hopkins as a bartender and had no difficulty with him. The only basis for a jury issue advocated by the plaintiff, both in the trial court and this Court, is the plaintiff's contention that in every case like the instant one, the employer must inquire concerning the possible criminal record of a prospective employee. However, as previously discussed, we cannot accept such a proposition.

> *Judgment of the Superior Court of Baltimore City affirmed.*
> *Appellant to pay costs.*