479 A.2d 1375

**Larry Leroy HENLEY, et al.**

v.

**PRINCE GEORGE'S COUNTY, Maryland, et al.**

**No. 1183, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Sept. 6, 1984.

Certiorari Granted Jan. 9, 1985.

26

John J. Pyne, Washington, D.C., with whom were William P. Dale, Kurt C. Rommel and McChesney, Pyne & Duncan, P.C., Washington, D.C., on the brief, for appellants.

Leonard L. Lipshultz, Silver Spring, with whom were Victor I. Weiner, Lipshultz and Hone, Chartered, Silver Spring, Don F. Ryder, Jr. and Schroeder, Ryder & Braden, Rockville, on the brief for appellee, Jones.

Sherrie L. Krauser, Upper Marlboro, for appellees, Bd. of Trustees of Prince George's Community College and Prince George's County, Md, with whom were Daniel I. Sherry, Bowie, Thomas P. Smith, County Atty., for Prince George's County and Michael O. Connaughton, Deputy County Atty., Upper Marlboro, on the brief, for appellees.

Argued before MOYLAN, WILNER and BISHOP, JJ.

BISHOP, Judge.

In the early evening of Saturday, June 17, 1978, Charles Wantland sexually assaulted and murdered a twelve year old boy whose body was found on the grounds of the Berger Mansion, in the Clinton region of Prince George's County. For these acts, Wantland was convicted of first degree murder, first degree sexual offense, and carrying openly a deadly weapon with intent to injure. *Wantland v. State*, 45 Md.App. 527, 413 A.2d 1376 (1980), *vacated and remanded* 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 386 *conviction affirmed*, 49 Md.App. 636, 435 A.2d 102 (1981).

In August of 1979, the boy's parents, Larry and Carole Henley, filed a wrongful death and survival action against Wantland and the appellees here—Jack Jones trading as Capitol Building and Remodeling Co., Prince George's County, and the Prince George's County Community College. The second amended complaint alleged that the appellees were responsible for Wantland's actions because appellee

Jones negligently employed him as a caretaker/security person at the mansion and grounds, or because all three appellees breached their duties as owners or occupiers of that property.

The circuit court (Rea, J.) entered a default judgment against Wantland, subject to *ex parte* proof of damages. It also granted appellees' motions for summary judgment and ordered entry of final judgments in their favor.

Appellants ask:

1. Whether the trial court erroneously granted summary judgment on the ground that Jones was not liable for negligently hiring and retaining Charles Wantland as a caretaker/security person.

2. Whether the trial court erroneously granted summary judgment on the grounds that all the defendants could not be held liable for breaching their duties as owners or occupiers of land.

Appellee College bought the Berger Mansion and surrounding acreage for possible future expansion of its campus. In May 1978 appellee County entered into a use agreement with the college for the purpose of conducting a job training program under the Federal Comprehensive Employment and Training Act of 1973. Pub.L. No. 93–203, 87 Stat. 839. The County agreed to assume the costs of utilities, maintenance, upkeep and security. The County then entered into an agreement with appellee John H. Jones, trading as Capitol Building and Remodeling Company. Jones agreed to provide sixty enrollees with training in building and remodeling skills, such as plumbing and carpentry. Half of the enrollees were to be ordinary civilians; half were to be former prison inmates and current inmates on release programs. One of the purposes of this program was to provide vocational rehabilitation to convicts, so that they would be able to assume productive job positions in the civilian world upon their release.

Jones employed two ex-offenders, Milton Gordon and Albert Ruffin, as the program director and assistant di-

rector, respectively. Ruffin also transported the workers and performed custodial chores, maintaining the mansion and grounds. Because he completed these tasks late in the evening, he resided in the mansion. Ruffin acted as caretaker in his capacity as "Ruffin Maintenance and Repair." He said, "They may have referred to me in terms of security. I just remember that they did." Ruffin twice took it upon himself to tell trespassers to leave the grounds. Both Gordon and Ruffin deposed that the latter had to arrange his residence in the mansion with the County because this was outside of his duties with the program. In response to an interrogatory, the County answered that, "the allocation for security was [sic] specifically provided for a salary to Albert Ruffin for his work as caretaker of the premises, as requested by Capitol [John H. Jones t/a Capitol Building & Remodeling.]"

Charles Wantland had been sentenced to 30 years' imprisonment for second degree murder, and previously had been convicted of various other crimes, including repeated instances of drunken and disorderly conduct. After serving about six years at the Patuxent Institution, he met the criteria for minimum security status, including an infraction-free record, for a period of time, and a recommendation from a counselor or psychologist or psychiatric social worker. After a separate hearing process, he was placed on work release status (not parole) and was referred to the County program run by Jones. He was approved for the program by the Mayor's Office on Manpower Resources, in Baltimore, and by the State Division of Vocational Rehabilitation. Director Gordon testified that he did not receive a complete record of Wantland's offenses, but was aware that his criminal background was extensive. Gordon ascertained that Wantland had no sexual-related offenses in his background before hiring him to work first as a carpentry trainee and then as a carpentry instructor on a 9-to-5 basis, five days a week.

Lacking car or residence, Wantland asked for and received permission from Director Gordon to live in the man-

sion. Gordon asked Ruffin if he had any objection to Wantland living there. Ruffin had no objection, and Wantland moved in about a week before the murder.

Some vandalism had occurred at the mansion, so Ruffin and Wantland agreed that one of them would be on the premises all the time. The program's secretary, Patricia Lau, understood from "talk around" that they were supposed to coordinate their "times of being there."

Ruffin said that he probably mentioned this arrangement to Gordon. Gordon testified on deposition that neither he nor Jones' company asked Wantland to perform any type of off-duty services such as security, maintenance, or upkeep either at night or on weekends. Gordon stated he did not indicate to Wantland that he was to perform any kind of backup service to Ruffin when Ruffin was not there. Jones averred that Ruffin was the only person he employed at the Clinton Center project (as this program was called) in the capacity of caretaker or security personnel.

Ruffin was asked on deposition:

"Q To your knowledge, was Wantland supposed to perform caretaker services to assist you in any way?

       \*      \*      \*      \*      \*      \*

THE WITNESS: Was he supposed to assist me?
MR. PYNE: Yes.
THE WITNESS: No. Do you mean assist me in any capacity other than as an instructor?
MR. LEVIN: Yes, that is the question.
THE WITNESS: No.
BY MR. PYNE:
Q Was there ever any discussion between you and Milton Gordon, or was there any discussion between you, Milton Gordon and Wantland, or between you and Wantland regarding his presence there overnight as being an additional protection against vandalism?

       \*      \*      \*      \*      \*      \*

THE WITNESS: The vandalism had gotten to such a proportion that if I left the grounds, the vandals came on the grounds. So Wantland and I had come to an agreement that one of us would be there all of the time. That didn't stop them, either. They still came.

Q You already testified that you did tell people to get off the premises; is that right?

A That's right.

Q Did you just assume that you had the authority to do that? Did somebody tell you that you had the authority to do that?

\* \* \* \* \* \*

THE WITNESS: I assumed that that was my responsibility, and I took that upon myself.

BY MR. PYNE:

Q Did you ever have any discussion with Wantland that he had the same responsibility when you were not there?

A No. We didn't discuss it. He told me once that he had hollered off of the second floor balcony to somebody who was going through. As a matter of fact, it was a man and a child with a rifle on that occasion."

Appellees moved for summary judgment on grounds that this and other evidence produced during discovery failed to establish any basis for holding them civilly liable for Wantland's criminal acts. After conducting a hearing on May 13, 1983, the court rendered a written opinion and order dated June 2, 1983, granting appellees' motions. The opinion stated, in part:

"It is clear that by the *Furr* case, *Furr v. Spring Grove Hospital*, 53 Md.App. 474, 454 A.2d 414 (1983), that clearly Maryland feels that third parties should not be *per se* made liable for the criminal acts of people who have either psychological or criminal backgrounds. Even though some or all of the three defendants knew about Wantland's previous criminal background, it is the Opinion of the Court that once the institution to which Mr.

Wantland was incarcerated saw fit to release him into the general public that this creates no liability on any element of the general public for the criminal acts of Mr. Wantland, *per se*, and the Court is of the Opinion that because Mr. Wantland obtained shelter as a bare licensee, no duty thereby was created to the decedent. The Plaintiffs made much of *Evans v. Morsell*, 284 Md. 160, 395 A.2d 480 (1978) and related cases as to negligent hiring. The Court is of the Opinion that clearly by the record revealed as a whole, the only employment by any or all of the Defendants of Charles Wantland was as an instructor in carpentry during normal business hours and that this employment created no duty to the decedent, because clearly the murder occurred on a Saturday afternoon on what could be styled as Wantland's recreational time. The Court is not of the opinion that because an employer employs someone that he insures the entire world that that employee will not do some criminal act."

The accompanying order instructed the clerk of court to enter final judgment in appellees' favor forthwith. Final judgment as to them was entered that day although damages had not been assessed against Wantland. On July 1, 1983, appellants moved pursuant to Rule 625 to set aside the order because it improperly resolved factual disputes and because there was additional evidence demonstrating the existence of genuine disputes of material fact. The additional evidence took the form of an affidavit by William Rawles, a participant in the job training program, who averred:

"9. That about a week or two weeks before I heard that Donald Henley was killed, I heard Albert Ruffin and Milton Gordon talking about these burglaries. I heard them talk about moving Wantland into the Mansion to be sure that someone was there at night to help prevent the thefts.

10. That on the Thursday or Friday prior to the murder of Donald Henley the following discussion took place between Charles M. Wantland and myself:

Wantland—'I think I know who is doing the breakins.'

Me—'Then why don't you call the police?'

Wantland—'Fuck the damn police. I can take care of it myself. If I catch who's doing it I'm going to tie him to a tree and fuck him to death.'

11. That I became concerned that Charles Wantland *did* intend to injure someone and that I therefore reported the conversation to the man in charge, Albert Ruffin, on that same Thursday or Friday. The following conversation took place:

Me—'Is that fellow Charlie alright? If it's one of these dudes doing the break-ins they'd better be careful. He's talking about tying him to a tree and fucking him to death.'

Ruffin—'What the fuck are you worried about? Don't worry about it.' "

Wantland sexually assaulted and stabbed appellants' decedent to death that Saturday, one or two days later.

Appellants moved in the alternative for an express determination that there was no just reason for delay and for an express direction for the entry of judgment.

The court sustained its grants of summary judgments on July 7, 1983. At appellants' instance, it issued an order dated July 13, 1983, which expressly ordered that the clerk enter final judgment in appellees' favor as there was no just reason for delay. *See* Rule 605(a) (1983).

### Law

■ Appellants argue that the circuit court improperly substituted summary judgment for trial of their action. They urge that even meager evidence of negligence is sufficient to withstand a motion for summary judgment, and that a genuine dispute as to any material fact or as to the inferences to be drawn from undisputed facts requires trial. *Citing, e.g., Coffey v. Derby Steel Co.,* 291 Md. 241, 434 A.2d 564 (1981); *Mass Transit Adm. v. Miller,* 271 Md. 256, 259, 315 A.2d 772 (1974); *Krol v. York Terrace Bldg.,*

*Inc.,* 35 Md.App. 321, 333–34, 370 A.2d 589 (1977). On the other hand if there is no genuine dispute as to an essential element of a claim, it is proper to enter summary judgment, notwithstanding the existence of genuine disputes about other issues. *See Furr v. Spring Grove State Hospital,* 53 Md.App. 474, 486, 454 A.2d 414 (1983); *Woodward v. Newstein,* 37 Md.App. 285, 298, 377 A.2d 535 (1977). In this case, appellants have failed to adduce evidence of a special relation between Wantland and the appellees that would render appellees responsible for his actions.

As a general rule, one has no duty to protect another from criminal acts by a third party, absent a statute or special relation imposing such a duty. The Restatement (Second) of Torts, section 315, provides:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Cited in *Scott v. Watson,* 278 Md. 160, 166–7, 359 A.2d 548 (1976); *Furr v. Spring Grove State Hospital, supra,* 53 Md.App. at 482, 488, 454 A.2d 414 (1983). *See Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 75–76, 614 P.2d 728, 733–34 (1980); *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 22–23, 551 P.2d 334, 342–43 (1976). *See generally,* Harper & Kime, "The Duty to Control the Conduct of Another," 43 Yale Law Journal 886 (1934); Annot., 10 A.L.R.3d 619, § 3 (1966). In their first argument appellants seek to establish that there was an employment relationship between appellee Jones and Wantland within the meaning of Restatement section 315(a). In their second argument, appellants seek to establish a special relationship between all the appellees and decedent, within the meaning of Restatement section 315(b).

*Furr v. Spring Grove State Hospital, supra,* holds that officials who release an inmate may not generally be held liable for his subsequent torts. Since the former inmate must work and live somewhere, it follows that his employer and landlord, who cannot second-guess the wisdom of his release, may not be held liable for his actions any more than could the releasing officials, unless they unreasonably raise the risk of tortious conduct. For this reason, appellees cannot be held responsible for Wantland's conduct based solely on his employment as a carpentry instructor or his residence at the Berger mansion.

To hold otherwise would place all employers and land-lords in an unacceptable dilemma: they would be compelled to reject released offenders' applications automatically, or to insure against the risk of recidivism. Such a policy would discourage rehabilitation of the former offender and impede his chances of successful reentry into society. *Cf. Vu v. Singer Co.,* 706 F.2d 1027, 1030 (9th Cir.1983). We noted in *Furr,* "As we impose upon samaritans (and those who walk in their shadow) more obligations in the nature of *Tarasoff's,* we must avoid driving them to the other side of the road." 53 Md.App. at 489, 454 A.2d 414. The issue, then, is whether there is evidence that appellees unreasonably raised the risk that Wantland would commit an intentional tort.

### 1. *Negligent Hiring*

An employer may be held responsible for the torts of his employee under three distinct theories: respondeat superior, negligent entrustment, and negligent hiring. *See generally* Note, 11 U.Balt.L.Rev. 435, 437–40 (1980). Appellants do not rely on respondeat superior or negligent entrustment theories to support their position on appeal. *See Evans v. Morsell,* 284 Md. 160, 164 n. 2, 395 A.2d 480 (1978). Appellants rely on the third theory, arguing that appellee Jones, acting through program Director Gordon and Assistant Director Ruffin, negligently hired and negligently retained Wantland in a caretaker or security posi-

tion.  Since Gordon knew of Wantland's criminal record, and knew that vandals had been trespassing in the Berger mansion, appellants contend that placing Wantland in this position foreseeably enhanced the likelihood that he would confront and deal violently with strangers he encountered on the property.

Maryland has recognized the employer's obligation to the public to use due care in selecting and retaining only competent and careful employees. *Norfolk & West. R.R. Co. v. Hoover,* 79 Md. 253, 262, 29 A. 994 (1894); *Evans v. Morsell, supra; Athas v. Hill,* 54 Md.App. 293, 295, 458 A.2d 859 (1983). *See also Fleming v. Bronfin,* 80 A.2d 915 (D.C.1951); Restatement Second of Agency, § 213 and comment (d) (1958); Annot., 34 A.L.R.2d 372 at 390, § 9 (1954); 57 C.J.S. *Master and Servant* § 559 (1948).  Unlike respondeat superior, which holds the employer vicariously liable for certain employee torts, this cause of action is based on the employer's breach of his duty of care, which is nondelegable.  "...[T]he employer remains liable in respect to the duty for the omission or neglect of the person to whom he entrusts the duty." *Athas v. Hill, supra,* 54 Md.App. at 296, 458 A.2d 859.

■  The plaintiff bringing a negligent hiring or retention claim has the burden of proving five elements:

"(1) the existence of an employment relationship;

(2) the employee's incompetence;

(3) the employer's actual or constructive knowledge of such incompetence;

(4) the employee's act or omission causing the plaintiff's injuries;  and

(5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries."

2 Am.Jur. Proof of Facts 2d 609, 615 (1974).  *See* Note, 9 U.Balt.L.Rev. 435, 441–42 (1980).

*First,* the plaintiff must show that there was an employment relationship between the defendant and the person who caused the plaintiff's injury. *Pascoe v. Meadowmoor Dairies,* 41 Ill.App.2d 52, 190 N.E.2d 156 (Ill.App.Ct.1963).

■ *Second,* he must show that the employee was unfit for the job, posing an unreasonable risk to those members of the public who would foreseeably come into contact with him. Appellee Jones suggests that the victim must be readily identifiable, as required in *Tarasoff v. Regents of University of California, supra; Thompson v. County of Alameda, supra* and *Vu v. Singer Co., supra,* at 1029.

We see no reason to depart from general tort principles by circumscribing the extent of an employer's duty to such a restricted subset of the class of foreseeable victims. The Supreme Court of New Jersey dealt with the same question regarding the employer's scope of duty in employing someone:

> "This does not require a specific forecasting of particularly identifiable victims or a precise prediction of the exact harm that may result from the conduct. Rather, we have recognized that a party may be liable to persons who fall normally and generally within a zone of risk created by the particular tortious conduct."

*DiCosala v. Kay,* 91 N.J. 159, 450 A.2d 508, 517 (1982). In this case, even an unidentified trespasser would have been in the zone of risk, as Wantland would have been likely to confront such an individual.

■ *Third,* the plaintiff must show that the employer knew or should have known that the employee was potentially dangerous. *Evans v. Morsell, supra,* 284 Md. at 165–66, 395 A.2d 480; *Vanderhule v. Berinstein,* 136 N.Y. S.2d 95, 285 App.Div. 290 (1954); *Hersh v. Kentfield Builders, Inc.,* 189 N.W.2d 286, 385 Mich. 410 (1971). The employer is entitled to a rebuttable presumption of due care. *Evans v. Morsell, supra,* 284 Md. at 165, 395 A.2d 480. In certain cases, this presumption may be rebutted by showing that the employer knew or should have known of his employee's criminal record. *See generally,* Annot., 48 A.L.R.3d 359 (1973). The fact that the employer knows of his employee's criminal record does not necessarily imply negligence on his part. *Evans v. Morsell, supra,* 284 Md.

at 167 n. 4, 395 A.2d 480. We have already discussed the undesirability of discouraging employment of ex-offenders. Moreover, as the *Evans* Court notes,

"[W]hen one has completed a criminal sentence or has been paroled, the employer to some extent is entitled to rely upon the determination of the government's criminal justice system that the individual is ready to again become an active member of society."

*Id.* at 167, 395 A.2d 480. The Court continues in a footnote:

"There are limits to this idea, however, depending upon the sensitivity of the position, the nature of the past criminal conduct and the surrounding circumstances."

*Id.* at 167 n. 5, 395 A.2d 480.

■ For example, hiring a person with a lengthy criminal record to be a security guard may indeed constitute negligence. *Estate of Arrington v. Fields,* 578 S.W.2d 173 (Tex.Civ.App.1979).

■ . *Fourth,* the plaintiff must show that the employee was the cause in fact of his injury, and *fifth,* that the employer's negligent hiring or retention of the unfit employee proximately caused that injury. *Lancaster v. Canuel,* 193 A.2d 555, 558 (D.C.1963). Unlike respondeat superior, a claim of negligent employment does not require proof that the employee's tort was committed in the scope of employment, as long as proximate cause is established. *Stricklin v. Parsons Stockyard Company,* 192 Kan. 360, 388 P.2d 824, 829 (1964); *Fleming v. Bronfin, supra,* 80 A.2d at 917, *quoted in Evans v. Morsell, supra,* 284 Md. at 166, 395 A.2d 480; 53 Am.Jur.2d *Master and Servant* § 422 at 437 (1970); Annot., 48 A.L.R.3d 359, 361 (1973).

In the present case, appellants have failed to adduce evidence of the first element of negligent employment: the employment relationship.

"Several criteria have been applied from time to time in determining the existence of an employer-employee relationship: the right to control and direct the worker in the performance and manner of doing the work (declared by the Court of Appeals in *Thompson v. Paul C. Thompson*

*& Sons,* 258 Md. 391, 395 [265 A.2d 915], to be 'the most decisive test'), the selection and engagement of the worker, the payment of wages, the power of dismissal, whether the work is a part of the regular business of the employer, whether the parties believe they were (sic) creating the relationship of employer and employee. *Idem; Loving Helicopters v. Kaufman,* 13 Md.App. 418, 423 [283 A.2d 640]."

*William J. Burns Int'l v. Ferris,* 16 Md.App. 568, 575–76, 299 A.2d 487 (1973).

These criteria are important, not because they distinguish an employee from an independent contractor—an employer may be liable for negligently hiring either, *Evans v. Morsell, supra,* 284 Md. at 166 n. 3, 395 A.2d 480—but because they show that the employer was put on notice of his responsibility to evaluate the qualifications of the employee. Appellants have presented no evidence under these criteria to show that appellee Jones hired Wantland for a caretaker or security position. The evidence merely shows that Wantland asked for and was given permission by program Director Gordon to reside in the mansion. Gordon and Assistant Director Ruffin hoped that his presence as a resident would deter vandals, as occupancy generally discourages trespassers. To maintain this deterrent effect, Ruffin and Wantland arranged the times at which they would occupy the mansion. Not all arrangements constitute employer/employee or master/servant relationships. *See Hoerr v. Hanline,* 219 Md. 413, 420–21, 149 A.2d 378 (1959). This arrangement was informal, with no evidence of a bargained-for exchange of benefits establishing a contract of employment. *Lockerman v. Prince George's County,* 281 Md. 195, 198, 377 A.2d 1177 (1977) ("relation of employer and employee is contractual"). There was no evidence that the parties believed they were creating an employment relationship which included security duties for Wantland. Jones, Gordon, and Ruffin expressly disclaimed any such relationship. Wantland evidently felt that his arrangement with Ruffin was informal, not

binding, for when Ruffin left the grounds on Sunday, June 17, 1983, Wantland left the grounds also, and was seen prior to the murder walking near the victim along a road. *Wantland v. State, supra,* 45 Md.App. at 542, 413 A.2d 1376. Appellants have simply failed to produce evidence of an employment relationship with reference to security duties—an obviously essential ingredient of a negligent employment claim.

Where, as here, only one inference can be drawn as to the existence *vel non* of an employment relationship it is proper for the trial court to rule as it did. *See Globe Indemnity Co. v. Victill Corp.,* 208 Md. 573, 585, 119 A.2d 423 (1956).

██ Proof of proximate causation was also lacking. Wantland had the same opportunity to commit the crimes as a resident, without caretaker status. Appellants' position perforce must be that Wantland's alleged employment in a security position increased his motivation to confront and deal with vandals to the point that he committed crimes he would not otherwise have committed. Any resident, however, may feel a responsibility to ward off trespassers and vandals. And Wantland, as a carpentry instructor during the week, already had motivation to stem vandalism. Even assuming negligent employment, we can only speculate as to whether he would not have committed the crimes but for that employment. Absent such evidence, there is no reason to hold appellee Jones liable for Wantland's tort. *See Scott v. Watson,* 278 Md. 160, 171–73, 359 A.2d 548 (1976) (if defendant creates *opportunity* that enhances risk of third party crime, defendant is liable.)

### 2. *Owners or Occupiers*

██ Appellants contend in the alternative that appellees —Jones, the College and the County—as owners or occupiers of the Berger Mansion and grounds, breached their duty to protect plaintiffs' decedent from a dangerous condition on the grounds—*i.e.,* Wantland. As our previous analysis of *Furr* makes clear, one cannot be held liable simply for providing housing to an ex-offender. All of the evidence

presented as of May 13, 1983, (the day oral argument was held on appellees' motions for summary judgments) showed only that Wantland was allowed to reside at the mansion. Based on this evidence, the court properly entered summary judgment against appellants on June 2, 1983.

On July 1, 1983, appellants moved to set aside the summary judgments. The motion was based in part on newly discovered evidence. Appellants learned on May 24, eleven days after oral argument and nine days before the court granted the motions for summary judgments that William Rawles had told Assistant Director Ruffin of Wantland's threat to harm a vandal. Rawles' June 15, 1983 affidavit, from which we have quoted, was filed with the appellants' motion on July 1, 1983. The court considered appellants' motion, and, on July 7, 1983, sustained its grant of summary judgments as to all appellees.

Given that the court's initial order granting summary judgment was proper, the issue on appeal is whether it abused its discretion in denying appellants' motion to set aside that order.

"In reviewing the granting of the summary judgment itself, we are concerned with whether the trial judge was legally correct. In reviewing the denial of a motion to strike a summary judgment, on the other hand, we are concerned only with whether the trial judge abused his discretion. *Clarke Baridon v. Union Co.*, 218 Md. 480, 147 A.2d 221 (1958). These are distinct types of decision. The critical question for the trial court vis-a-vis the ... summary judgment was whether there existed a genuine dispute as to a material fact and, if not, what the ruling of law should be upon those undisputed facts. The critical question for the trial court vis-a-vis the ... motion [to strike] was whether the appellant had shown a reasonable indication of a meritorious defense to the motion or other equitable circumstances that would justify striking the judgment—that is, whether the court entertained a reasonable doubt that justice had been done in the earlier granting of the summary judgment. *Abrams v. Gay*

*Investment Co.*, 253 Md. 121, 251 A.2d 876 (1969); *Clarke Baridon v. Union Co., supra; Cromwell v. Ripley*, 11 Md.App. 173, 176–177, 273 A.2d 218 (1971)." *Brewer v. Mele*, 267 Md. 437, 441, 298 A.2d 156 (1972).

Introduction of the Rawles affidavit does not establish such an abuse of discretion. Even if we disregard appellants' lack of diligence in discovering and producing this evidence, we would still find no abuse. Appellants would hold appellees responsible for Wantland's criminal acts because of a remark Wantland made one or two days before committing the crime. When informed of the statement, Ruffin, another resident at the mansion, took it as merely rough language, which may have been common among program participants. There is no evidence that the County, the college, or Jones was told of the remark. The implication of appellant's position would place an intolerable burden on landlords, for it would hold them responsible for any potentially threatening statements made by a tenant who has a criminal record. The affidavit presented no reason for the court, in its discretion, to strike its grant of summary judgments. Finding no abuse of discretion we affirm the court's decision.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.