583 So.2d 744 (1991)
TALLAHASSEE FURNITURE COMPANY, INC., a Florida Corporation, Appellant,
v.
Elizabeth Holland HARRISON, Appellee.
No. 89-2163.
District Court of Appeal of Florida, First District.
July 31, 1991.
Rehearing Denied August 30, 1991.
*747 Robert Scott Cox of Messer, Vickers, Caparello, French & Madsen, P.A., and David H. Burns of Huey, Guilday, Kuersteiner & Tucker, P.A., Tallahassee, for appellant.
W. Dexter Douglass and John C. Cooper of Douglass, Cooper, Coppins & Powell, Tallahassee, for appellee.
Richard M. Davis, Sr. Vice President and Gen. Counsel of Associated Industries, Inc., Tallahassee, for amici curiae/Associated Industries of Florida, Inc., Florida Chamber of Commerce, Inc., Florida Retail Federation, Inc., Florida Ass'n of Ins. Agents, Inc., Nat. Federation of Independent Business, Inc., and Florida Movers & Warehousemen's Ass'n, Inc.
SMITH, Judge.
Appellant, Tallahassee Furniture Company, Inc., appeals from a jury verdict finding it liable for personal injuries suffered by the appellee, Elizabeth Holland Harrison, and awarding compensatory and punitive damages. For the reasons discussed below, we affirm.
On January 1, 1986, Harrison was brutally attacked in her home by John Allen Turner, a furniture deliveryman employed by Tallahassee Furniture. The attack left Harrison with permanent scarring and disfigurement, loss of one eye, and partial paralysis in both hands. Harrison filed suit, alleging in her complaint that Tallahassee Furniture was negligent in hiring and retaining Turner, and that Tallahassee Furniture was also liable on an agency theory. A summary judgment in favor of *748 Tallahassee Furniture was reversed on appeal, Harrison v. Tallahassee Furniture Co., Inc., 529 So.2d 790 (Fla. 1st DCA 1988), when this court held that the existence of numerous issues of fact made summary judgment inappropriate. On remand, after a six-day trial at which Harrison presented the testimony of 21 witnesses, the jury returned a general verdict in favor of Harrison for $1,900,000 in compensatory damages, and $600,000 punitive damages. This appeal followed.
Tallahassee Furniture argues for reversal primarily upon five grounds: (1) that the trial court erred in submitting the theories of actual or apparent agency to the jury; (2) that Tallahassee Furniture satisfied its duty of reasonable care in hiring and retaining Turner, and was thus entitled to judgment as a matter of law; (3) that the trial court reversibly erred in admitting into evidence Turner's psychiatric and criminal records, including juvenile offenses; (4) that Tallahassee Furniture did not proximately cause Harrison's injuries; and (5) that the court erred in submitting the issue of punitive damages to the jury.

I. FACTUAL BACKGROUND
The evidence at trial established that prior to being employed in the job he held at the time Harrison was injured, John Allen Turner had performed some work as a laborer on construction projects for a company owned in part by a managing agent of Tallahassee Furniture, and he had performed odd jobs and yard work for the managers of Tallahassee Furniture. As a result of this experience with Turner, he was then hired to work part-time for Tallahassee Furniture at what was referred to as the "fairground sale," a semiannual event involving the sale of household furniture and other merchandise at the local fairgrounds. Sometime in the spring of 1985, after working part-time for approximately three months, Turner was hired to work full-time as a furniture deliveryman. Although this job entailed the delivery to customers' homes on a daily basis at times prearranged with the customers, no job interview was conducted, no references were requested, and Turner was not asked to complete a job application form. Turner was first hired to work as a junior member of a two-man delivery crew, in which the driver was the lead employee. By the late summer of 1985, Turner became a driver and was allowed to drive a company truck home.
Harrison was a student at Florida State University, living alone in an apartment. For her birthday, Harrison's father, a stockholder in Tallahassee Furniture, offered to buy her a couch of her choice. She picked out a couch from Tallahassee Furniture and made arrangements to have it delivered. Turner and another employee delivered the couch sometime in October 1985, at which time the delivery crew also assisted Harrison in moving a bed and a few other belongings to a new apartment, the place where Turner's attack upon Harrison later took place. During this moving process, Harrison offered the deliverymen a broken television set, which she said she wanted to discard, but was unable to carry it down three flights of stairs. Turner accepted it. Harrison later discovered the couch was defective, a new couch was ordered, and Harrison was told that it would arrive around Christmas.
On New Year's Eve, Harrison fell asleep while watching television on her couch. She was awakened the next morning, on New Year's Day, by a knock on her door. She recognized the man at the door as one of the men who delivered her couch. Turner told Harrison that he needed a receipt for the television set she had given him, because "they," which Harrison assumed meant Tallahassee Furniture, thought he had stolen it. Harrison agreed to write a receipt and left the door ajar. While she was writing the receipt, Turner looked inside and asked if he could use the bathroom. Harrison told him he could. After Turner entered the house, he went into the kitchen area, then suddenly reappeared with a knife in the living room, where Harrison was writing the receipt, and attacked Harrison, threatening to kill her. When Harrison pleaded with him, he suddenly released her and said he was sorry and that he was "screwed up" and on *749 drugs, and told her to go call the police. Instead, Harrison, terrified, ran into the bathroom and locked the door. Unfortunately, Turner pursued her, broke the door open, savagely stabbed her with the knife, and bludgeoned her into unconsciousness while she lay bleeding on the bathroom floor. Miraculously, Harrison regained consciousness after Turner left the apartment, and was able to reach the front door, where her cries for help were heard by neighbors.
When police officers arrived at the scene of the attack, Harrison told the officers that her assailant was John Allen Turner, a Tallahassee Furniture employee. At this time, Turner reappeared at the apartment driving a Tallahassee Furniture delivery truck. Police approached the driver and asked for a driver's license. Seeing the name John Allen Turner, Turner was arrested.
During the presentation of plaintiff's case, Harrison presented extensive evidence establishing Turner's unfitness for employment for duties involving the entry of customers' homes. This included proof that Turner had a juvenile record for armed robbery and burglary in 1976; adult records of arrest for assault and battery; a charge of aggravated battery in 1979; a conviction for battery involving cutting his former wife in the face with a knife; additional charges of battery on his wife in 1981; and voluntary hospitalization for psychiatric problems on two occasions, in 1979 and 1981, with a diagnosis of paranoid schizophrenia, including reported delusions of voices telling him to kill himself and to kill other people. Turner had been heavily using drugs preceding both periods of hospitalization. Further, Turner had been using cocaine intravenously for about a year prior to his attack on Harrison, and had been using heroin intravenously for about two months. In addition, Turner had been fired by his prior employer. At the time of his arrest, Turner had clearly visible "track marks" on both arms, indicating heavy intravenous drug use, which were still apparent at the end of January 1986. He was examined by two court-appointed psychologists and was found incompetent to stand trial in January and even as late as March 1986. One of the psychologists testified that in March, Turner was making bizarre comments, hearing voices, and seeing people when there was no one present.
Although much of the trial and argument below dealt with proof of Turner's unfitness for employment and continued retention in the job he held on the day of his attack on Harrison, as the trial progressed this became less of an issue, given testimony by the representatives of the management of Tallahassee Furniture that had they known of Turner's prior criminal record, his drug addiction, and psychiatric illness, Turner would not have been hired as a deliveryman.
Tallahassee Furniture's standard employment application form, which was never submitted to Turner, included a question requesting the applicant to disclose whether he or she had a personal history, even if slight, of drug addiction, nervous disorders, or psychiatric care, among other things. The form also included the question, "Have you ever been convicted of a crime?" and "If Yes, please explain." The form also requested a "yes" or "no" answer to the question, "Have you ever been arrested?" followed by the instruction, "If Yes, give details (omit minor traffic violations)." At least two of Tallahassee Furniture's representatives testified that it could be assumed that if the employment application had been requested, Turner would have furnished the information requested.

II. GENERAL VERDICT
As above noted, the case was submitted to the jury upon three alleged bases for liability: actual or apparent agency, negligent hiring, and negligent retention of the employee, Turner. However, since the several issues were submitted to the jury for consideration and return of a general verdict, without specifying the theory of recovery upon which liability was based, a favorable verdict for the plaintiff must be upheld if the evidence supports recovery on any one of the several theories alleged. Whitman v. Castlewood International *750 Corp., 383 So.2d 618 (Fla. 1980); Dean Witter Reynolds, Inc. v. Hammock, 489 So.2d 761 (Fla. 1st DCA 1986); Maser v. Fioretti, 498 So.2d 568 (Fla. 5th DCA 1986). Therefore, even if it is assumed, as appellant argues, that the case was improperly submitted to the jury on the issue of actual or apparent agency, the jury verdict must nevertheless be upheld if the evidence was sufficient to submit the issues of negligent hiring or retention to the jury. Further discussion of the agency issue will be deferred until later in this opinion, and we will turn our attention to the issue of negligent hiring or retention.

III. NEGLIGENT HIRING OR RETENTION
The concept of employer liability for negligent hiring or retention of an employee is not of recent vintage in the law of Florida, having found clear expression at least by 1954 in Mallory v. O'Neil, 69 So.2d 313 (Fla. 1954) (complaint alleged agent and caretaker of apartments, known to have prior record of charge and trial for assault to commit murder, but nevertheless kept on premises by owner, secured a gun and shot a tenant). Finding that the complaint stated a cause of action, the court stated that liability in such cases
is grounded on negligence of the defendant in knowingly keeping a dangerous servant on the premises which defendant knew or should have known was dangerous and incompetent and liable to do harm to the tenants.
Subsequent Florida decisions, beginning most notably with Williams v. Feather Sound, Inc., 386 So.2d 1238 (Fla. 2d DCA 1980), rev. denied, 392 So.2d 1374 (Fla. 1981), and including Abbott v. Payne, 457 So.2d 1156 (Fla. 4th DCA 1984), and Garcia v. Duffy, 492 So.2d 435 (Fla. 2d DCA 1986), have explored the cause of action in greater depth. Although few in number, these cases have contributed a substantial commentary on the elements of this cause of action and the factors to be considered in determining liability. Although both appellant and appellee in their respective briefs rely heavily on these cases, their interpretations of the rules and principles discussed differ somewhat, and their arguments as to the applicability to the particular facts in this case vary widely.
The basic underlying rule of employer liability was stated in Williams, 386 So.2d at 1239-1240:
Most jurisdictions, including Florida, recognize that independent of the doctrine of respondeat superior, an employer is liable for the willful tort of his employee committed against a third person if he knew or should have known that the employee was a threat to others. (footnotes omitted).
All authorities appear to agree, as stated in Williams, that central to the task of judging the employer's responsibility to investigate an employee's background is consideration of "the type of work to be done by the employee." Id. at 1240. Stated in terms of the "standard of care" required of an employer, the court in Garcia formulated the following test:
In general, the test is whether the employer exercised the level of care which, under all the circumstances, the reasonably prudent man would exercise in choosing or retaining an employee for the particular duties to be performed. (citations omitted).
492 So.2d at 440.
Where the facts are sufficient to show the existence of a legal duty, the reasonableness of an employer's efforts to inquire into the prospective employee's background, and the reasonableness of the subsequent decision to allow the employee to enter a customer's home, are jury questions. Abbott, 457 So.2d at 1157; see also, Williams, supra (summary judgment for employer reversed and case remanded for trial); cf. Garcia (no legal duty under facts alleged; dismissal of complaint affirmed).
Of particular concern in negligent hiring and retention cases is the basis for holding employers liable for employees' acts for which no liability would attach under the doctrine of respondeat superior. As explained in Garcia, if employers are to be exposed to liability for acts of their employees outside the scope of their employment, *751 there must be some rational basis for limiting the boundaries of that liability. That limitation is explained by the Garcia court as follows:
Only when an employer has somehow been responsible for bringing a third person into contact with an employee, whom the employer knows or should have known is predisposed to committing a wrong under circumstances that create an opportunity or enticement to commit such a wrong, should the law impose liability on the employer. (citations omitted).
492 So.2d at 439.
In a similar vein, the court in Ponticas v. K.M.S. Investments, 331 N.W.2d 907, 911 (Minn. 1983), further explained while referring to cases involving landlord's duty to use reasonable care in hiring employees:
The rationale employed in those cases, as well as in similar cases involving deliverymen or others who gain access to a dwelling by virtue of their employment, is that since plaintiff comes in contact with the employee as the direct result of the employment, and since the employer receives some benefit, even if only a potential or indirect benefit, by the contact between the plaintiff and the employee, there exists a duty on the employer to exercise reasonable care for the protection of the dwelling occupant to retain in such employment only those who, so far as can be reasonably ascertained, pose no threat to such occupant.
As the Williams court pointed out, the more difficult questions presented by these cases is "What, if any, responsibility does the employer have to try to learn the pertinent facts concerning his employee's character?" Id. at 1240. The Williams court gave the following considerations for trial of this issue: (1) what kind of inquiry "would have been reasonable under the circumstances"; (2) what is the information the employer "would likely have obtained had it made such inquiry"; and (3) what was "the cost of obtaining such information." Williams, 386 So.2d at 1241.
Answering the first of these questions, as to the duty of inquiry where an employee is given the authority to enter the living quarters of others, the Williams court stated the following rule:
If an employer wishes to give an employee the indicia of authority to enter into the living quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to do so.
Id. at 1240. The court then concluded that the employer, Feather Sound, did not carry out this responsibility since it made no effort to contact prior employers and did not seek advice from the employee's references. The court held, accordingly, that the trial court should not have granted a summary judgment in favor of the employer. From the foregoing discussion, we conclude, paraphrasing Williams, 386 So.2d at 1241, that the ultimate question of liability to be decided is whether it was reasonable for the employer to permit the employee to perform his job in the light of information about him which the employer should have known.
Addressing this ultimate issue, appellant presents two basic arguments: first, that appellant had no legal duty to independently investigate Turner's background because the job for which he was hired involved only incidental contact with customers; and, second, appellant contends that, as a matter of law, it met and exceeded its duty to evaluate Turner for the deliveryman position based upon appellant's actual experience with Turner in similar jobs. We find these arguments unavailing for several reasons.
As to the duty to "independently investigate," we readily accept appellant's acknowledgment that this entails something other than a personal interview of the employee, obtaining an employment application, or evaluation based upon actual observation and experience with the employee. Consequently, to simply say that there was no legal duty on the part of the employer in this case to make an "independent" investigation, does not mean that there was no duty to investigate before hiring Turner. In this case, by Tallahassee Furniture's own admission, there was no *752 "independent investigation" of Turner's fitness for employment as a deliveryman. Indeed, there was no "investigation" at all. Tallahassee Furniture conducted no job interview, nor did it obtain a written employment application from Turner, notwithstanding the fact that the company had on hand application forms which it generally used.
As to the claim that Turner's job involved only "incidental contact" with customers, we find no hard and fast rule in the case law classifying a retail furniture deliveryman job as involving "incidental contact," so as to relieve the employer of any "independent investigation." For this proposition, appellant relies upon dicta in the Williams case, in which the court said that when the employer in that case hired the employee to do outside work on the grounds of properties consisting of condominiums and residential home sites, during which he would only have "incidental contact" with the tenants, "we cannot see how [the employer] had any obligation on behalf of his company to make an independent inquiry concerning [the employee's] past if he did not want to." 386 So.2d at 1240. We do not find this language pertinent given the facts of this case. Even accepting the proposition that "outside work on the grounds" of a residential condominium community necessarily involves only "incidental contact" with tenants, it does not necessarily follow that a retail furniture store deliveryman entering customers' homes on a daily basis must also be so classified. Nor do we find it necessary, as appellant argues, to assume as a matter of law that unless an employee is given free and independent access by means of a passkey to enter customers' homes, the employment must be considered only "incidental contact," requiring no independent investigation.
In both Williams and Abbott, upon which appellant heavily relies, the employees had access to passkeys, and in both cases, the courts found a duty to conduct an investigation of the employees' background before hiring them. In neither case, however, did the court lay down the rule that unless passkey access was present, the employment should be considered as involving mere "incidental contact," and therefore not requiring investigation. As a practical matter, a review of the facts of both Williams and Abbott demonstrates the fallacy of appellant's argument on this issue. In Williams, the employee initially gained entry to the residence by ringing the doorbell and being voluntarily allowed to enter by the plaintiff. The assault on the plaintiff did not occur on that occasion, however, but occurred four days later when the employee again entered, but without permission.[1] In Abbott, the court found the complaint sufficient to state a cause of action based upon allegations that a pest control employee who had access to passkeys was allowed by the plaintiff to enter her home on one occasion, and that after the alleged employment had ended, the employee broke into the plaintiff's home at night and physically assaulted her. It is apparent from the foregoing that in neither Williams nor Abbott was the risk of harm to the tenants dependent upon passkey entry. On the other hand, in those cases, as in the case before us, the initial entry was gained by virtue of the "indicia of authority" conferred upon the employee and the assault or injury took place on a subsequent occasion. In the case before us, as in Williams and Abbott, the facts clearly show that entry and contact with the plaintiff was gained initially by virtue of the employment, with consent of the victim. It is apparent that the subsequent entry at the time of the assault in this case was also gained by virtue of the "indicia of authority" conferred upon the employee by his employment, while in Abbott the employee simply broke into the plaintiff's residence. Liability in these cases cannot logically be said to depend on the existence of passkey access.
*753 Appellant's second major argument regarding the claim of negligent hiring, as above noted, is that, as a matter of law, it "met and exceeded" its duty to evaluate Turner based upon actual employment experience with Turner in similar jobs. We disagree. Prior to being employed in the deliveryman position, Turner had done work as a laborer on an out-of-town construction site for one of the principals of Tallahassee Furniture and had done yard work at the home of another. These jobs do not remotely approach the customer-contact level of the "outside work on the grounds" mentioned in Williams, since there is no evidence that in these jobs Turner had any exposure whatsoever to customers or to the public generally. Turner had also been employed part-time on two occasions by appellant to assist in its fairground sales, which involved Turner's loading and unloading of furniture at the fairground warehouse and his assisting in placing purchased merchandise in customers' cars. Although this employment involved limited "customer contact," it was contact which might also be accurately described as "incidental contact" as the term is used in Williams. In any event, it is apparent that the fairground job did not involve intimate customer contact such as that involved in the entry of customers' homes.
Appellant's claim that it satisfied its duty to evaluate Turner's fitness for the deliveryman job, as a matter of law, must fail because the prior employment experience with Turner was not similar. Upon consideration of all the evidence relating to Tallahassee Furniture's knowledge of and experience with Turner, the jury could reasonably have concluded that Tallahassee Furniture judged Turner's employability upon the single criterion of whether his capacity as a laborer was sufficient to satisfy appellant's economic interests, rather than upon whether his character, conduct, and mental condition were such as to ensure the safety of its customers.
Our holding that the evidence was sufficient to go to the jury on the negligent hiring charge makes it unnecessary to decide whether the evidence was also sufficient to support the charge of negligent retention. However, in view of the serious consequences flowing from the appellant's negligent hiring of Turner, we deem it appropriate to also discuss appellant's contentions regarding the charge of negligent retention. Appellant urges, again, that it met its obligation to exercise reasonable care in its retention of Turner as an employee having access to customers' homes and that it, accordingly, is entitled to judgment as a matter of law on this issue. Again, we disagree.
Negligent retention of an employee occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicate his unfitness, but the employer fails to take further action, such as investigation, discharge, or reassignment. Garcia, 492 So.2d at 438, and cases cited therein. Appellant urges that, here, there is no evidence that it had notice of Turner's unfitness during his employment. Appellant reviews the evidence concerning two episodes during the employment which, to some extent, indicate unlawful activity on the part of Turner. The first incident involved Tallahassee Furniture's knowledge that Turner had been arrested for violation of probation received in connection with a charge of grand theft. The offense arose out of an incident in which he failed to return a rent-to-own television set. During his employment, appellant's management became aware of his arrest for violation of his probation for failure to make restitution as ordered, and the company advanced money to Turner to pay this obligation. The second incident involved Tallahassee Furniture's discovery, in the late fall of 1985, after Turner had been permitted to drive a truck, that Turner had no driver's license. In fact, Turner had not had a license for five years. Appellant urges that these two incidents, even accepting the fact that Tallahassee Furniture became aware of them during the course of Turner's employment, are not of such a serious nature that Tallahassee Furniture was on notice of Turner's unfitness for employment.
*754 We are inclined to agree that, standing alone, mere knowledge that the employee had in the past been subjected to a charge of grand theft in connection with failure to return a television set, and that he had undertaken to drive a truck without a valid license, does not appear to be sufficient to place Tallahassee Furniture on notice that Turner was unfit for employment as a deliveryman. On the other hand, Harrison presented the testimony of an expert in public and private security and in various criminological areas, that knowledge of these infractions was sufficient to reasonably indicate the need for further inquiry. In addition, however, Harrison presented evidence, without objection, that Turner was a heavy intravenous cocaine user during his entire full-time employment with Tallahassee Furniture and was a heavy intravenous heroin user during the last few months before his attack on Harrison; that his drug and alcohol use on the job was commonplace; and that he had indulged in the use of drugs on the premises at work with another employee, which was known to management of Tallahassee Furniture. Also without objection, evidence was presented that one of the principals of Tallahassee Furniture was aware of a prior psychiatric hospitalization. This evidence of Turner's unfitness was corroborated to a large extent by evidence of the track marks on both arms at the time of his arrest, by the finding of drug paraphernalia in his home (syringes and empty capsules), and by his incompetency from drug use and psychiatric problems continuing for several months after his arrest. The clear import of this evidence was that Tallahassee Furniture failed in its duty to exercise a reasonable degree of supervision and control over its service employees, a conclusion supported somewhat by evidence that appellant's dispatcher, who was Turner's supervisor and in charge of the daily assignment of deliveries to the homes of customers, was not aware that Turner had been given the personal use of a Tallahassee Furniture truck to drive home and for use during his off hours, on weekends, and on holidays. Significantly, no coemployee of Turner at Tallahassee Furniture serving in the capacity as a driver or deliveryman with Turner was called to testify as to Turner's activities on the job. Considering the evidence in its entirety, we are not of the view that it was error to submit the issue of negligent retention for resolution by the jury.
In appellant's argument on the negligent retention issue and in other parts of its brief, appellant contends that the evidence pertaining to Turner's drug use (other than the track marks on his arms) was inadmissible hearsay, in that it was based upon the testimony of Harrison's expert witness, Professor James White, who related statements made to him by Turner during a prison interview and who also relied upon an affidavit from Turner's wife regarding Turner's drug use. Appellant relies upon the rule that an expert witness cannot serve merely as a conduit for the presentation of inadmissible evidence, citing 3-M Corp. v. Brown, 475 So.2d 994, 998 (Fla. 1st DCA 1985), and Department of Corrections v. Williams, 549 So.2d 1071 (Fla. 5th DCA 1989).
We find this reliance misplaced. As appellee points out, hearsay evidence not objected to becomes part of the evidence in the case and is usable as proof just as any other evidence, limited only by its rational, persuasive power. Tri-State Systems, Inc. v. Department of Transportation, 500 So.2d 212, 215 (Fla. 1st DCA 1986), rev. denied, 506 So.2d 1041 (Fla. 1987). Further, an appellate court may consider only the objections to admissibility of evidence on the grounds specifically stated at trial, and will not consider those objections to admissibility urged for the first time on appeal. Tabasky v. Dreyfuss, 350 So.2d 520, 521 (Fla. 3d DCA 1977).
We have reviewed the record and find no objection on any grounds to the testimony of Professor White regarding his interview with Turner, nor as to his reliance on Turner's wife's affidavit. Furthermore, Turner's drug use and abuse was also established by the testimony of police officers *755 and the two examining psychologists, all of which was admitted without objection.[2]

IV. PROXIMATE CAUSE
Appellant urges that even assuming the existence of a duty on its part, under the circumstances, to investigate Turner's background before placing him in the deliveryman's job, and assuming negligence in hiring and retaining Turner, there can be no liability in this case because of the absence of a causal connection between its negligence and the subsequent injuries. Harrison's injuries, appellant maintains, were not a natural, direct, and continuous result of appellant's conduct. In making this argument, appellant refers to the familiar standard of causation followed in negligence actions by Florida courts, that in order to carry the burden of proof on the issue of causation, the plaintiff must present evidence which "affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." Prosser, Law of Torts § 41 (4th ed. 1971), quoted with approval, Gooding v. University Hospital Building, Inc., 445 So.2d 1015, 1018 (Fla. 1984); see also Cassel v. Price, 396 So.2d 258, 266 (Fla. 1st DCA), rev. denied, 407 So.2d 1102 (Fla. 1981).
Appellant argues that the attack on Harrison resulted not from appellant's negligent hiring or retention, but from Harrison's own "personal contacts" with Turner: Harrison's gift of the television set to Turner at the time of the couch delivery; and Turner's return to her apartment on New Year's Day for a receipt, together with Harrison's assent to Turner's entering her apartment "on the personal premise of [his] needing to use the bathroom" (quoting from appellant's brief). Appellant urges that these events were not the ordinary sequence of Turner's employment, pointing out that the initial (and only) employment-related contact was without incident, and that the lapse of time between that visit and the New Year's Day attack, approximately three months, so severed the two events that a reasonable person could find no substantial connection between the two. Furthermore, appellant finds the instant case analogous to: F & T Company v. Woods, 92 N.M. 697, 594 P.2d 745 (1979), Strauss v. Hotel Continental Company, Inc., 610 S.W.2d 109 (Miss.App. 1980), and Watson v. City of Hialeah, 552 So.2d 1146 (Fla. 3d DCA 1989). We disagree, both as to appellant's application of the law to the facts and its characterization of the pertinent facts of this case.
We think that it is clear, from our above discussion on the law of negligent hiring and retention, that the courts have recognized, as a matter of law, that there can be a causal connection between an employment-related contact in the home by an unfit or dangerous employee and an injury inflicted on the occupant during a later, non-employment related entry into the home. See Williams, Abbott, Garcia, and Ponticas, supra. Whether the employment-related contact and the later event in which the injuries occur are so separated by time or other circumstances that the former cannot reasonably be said to be a substantial factor in producing the result complained of depends upon the facts in each case. The issue of proximate cause is generally one for the jury unless reasonable persons cannot differ, in which case it becomes a matter of law for the court. Stahl v. Metropolitan Dade County, 438 So.2d 14 (Fla. 3d DCA 1983), quoted with approval, Department of Transportation v. Anglin, 502 So.2d 896, 899 (Fla. 1987).
The evidence in the case before us established without conflict that the sole contact between Harrison and Turner prior to New Year's Day 1986 was on the occasion of the furniture delivery some time in October 1985.[3] The gift of the television *756 set was the kind of incidental event reasonably expected to occur when a person is moving in or out of an apartment, when unneeded items are routinely disposed of. The evidence does not support appellant's contention that the gift of the television was a "personal contact" in logical or natural sequence leading to Turner's New Year's Day visit to Harrison's apartment. Instead, the evidence is virtually conclusive that Turner used the supposed need for a receipt as a pretext to present himself at the door of her apartment, knock on the door, and further identify himself to Harrison. Harrison testified that she recognized Turner from his uniform and his face as one of the persons who had delivered her couch.[4] When Turner requested a receipt, telling Harrison that he needed one so that "they" would not think he had stolen the television, she assumed "they" was Tallahassee Furniture. Having thus gained Harrison's recognition as someone who had previously been permitted to enter her home, the next step, getting her consent to enter the apartment by requesting to use the bathroom, does not appear to us to be such an unusual, extraordinary, or unexpected event as to be totally removed or separated from Turner's prior employer-authorized entry into Harrison's apartment. We do not believe that either the gift of the television set or the consent to enter the apartment to use the bathroom can reasonably be considered as intervening events requiring that appellant be relieved of liability as a matter of law. In order for an intervening cause to relieve the negligent party from liability, such intervening cause must be truly independent of and not set in motion by the original negligence. Anglin, supra, 502 So.2d at 898. Here, the initial entry into Harrison's apartment allowed Turner the opportunity to learn Harrison's age, sex, the physical features of her apartment, its location and proximity to other residences, and the fact that Harrison was single, lived alone, and was therefore unprotected. The evidence is susceptible to no other conclusion but that Turner had no means of access to Harrison's residence other than through the indicia of authority conferred upon him as a Tallahassee Furniture employee and that the visit on New Year's Day had no legitimate purpose, personal or otherwise, but at the same time was not a chance encounter. Turner had gone to great lengths the night before to obtain the use of an unmarked Tallahassee Furniture truck in place of the large, marked van he customarily drove, presumably to avoid identification by neighbors or passersby.[5]
Given the facts particular to this case, we believe the cases cited by appellant are distinguishable. In Woods, supra, the employee entered the plaintiff's home with permission to deliver a television set, and three days later broke into the home at night and raped the plaintiff. The court found that, as a matter of law, the act of the employee could not have been foreseen by the employer either at the time of hiring or during the employment, nor could the act be considered the natural or probable result of the retention of the employee. The court pointed out, however, that it did not intend to foreclose all causes of action for negligent hiring or retention; and that whether the hiring or retention constitutes negligence depends upon the facts and circumstances of each case.
*757 We conclude that the facts and circumstances of Woods differ from the case before us in that here, the entry at the time of the attack was gained by consent, based upon Harrison's previous employment-related contact with Turner, opposed to the unlawful break-in which occured in Woods. Further, on facts similar to those in Woods, the Florida court in Williams found that a jury issue was presented, and on even less compelling facts, the court in Abbott found a cause of action was stated. In addition, as pointed out by appellee, the New Mexico court's application of the law on causation and foreseeability in Woods may be somewhat out of harmony with Florida law. This is indicated, appellee argues, by the Woods' court's reference to case law of that state which precludes a finding of proximate cause for injuries resulting from an owner's leaving the keys in an unlocked motor vehicle, whereas the law of Florida rejects this view, and holds that a jury issue is presented in such a case. See Vining v. Avis Rent-A-Car, Systems, Inc., 354 So.2d 54 (Fla. 1977) (if an intervening criminal act is foreseeable, the chain of causation is not broken, and this rule is directly applicable to key-in-the-ignition cases; and statutory law requiring removal of key from unattended vehicle provides additional support for this position).
The facts in Strauss, supra, are far removed from those in the present case. In Strauss, the plaintiff appealed an unfavorable jury verdict. The plaintiff, a guest of the hotel, was assaulted by a student employed by a club as a locker room attendant on club premises located in the hotel building. As a hotel guest, the plaintiff was entitled to use the club facilities. The assault took place late in the evening, after the club was closed, when the plaintiff returned to the club premises pursuant to a social invitation by the attendant, following which the attendant attacked the plaintiff. The appellate court found that the plaintiff's evidence failed to establish either a negligent hiring or any proximate causation, and affirmed the jury verdict for all defendants.
In Watson, supra, where police officers staged a drug "rip-off" and murder outside the city and hence outside the officers' jurisdiction, the court found no causal connection between the officers' employment and continued retention by the city, and the murder. The court pointed out, among other things, that the police equipment  police badges, "rights cards," radios, and portable blue bubble light  used to gain entry by the officers, who were not in uniform, is readily available in the county and can be easily reproduced and forged. Further, the court found that none of the instances of the officers' employment misconduct was sufficiently egregious to charge the city with knowledge that the officers would commit murder and that their actions were so bizarre as to be beyond the scope of any fair assessment of the danger created by the city's negligence.
Appellant also maintains that the element of foreseeability is not present in this case and that, at most, Tallahassee Furniture's employment of Turner merely provided the occasion for Harrison to give Turner the television set and for Turner to use the television as a pretext to contact Harrison. Again, we disagree. As stated by this court in Paterson v. Deeb, 472 So.2d 1210, 1218 (Fla. 1st DCA 1985), rev. denied, 484 So.2d 8 (Fla. 1986):
In determining foreseeability, it is not necessary to "be able to foresee the exact nature and extent of the injuries or the precise manner in which the injuries occur"; it is only necessary that "the tortfeasor be able to foresee that some injury will likely result in some manner as a consequence of his negligent acts." Crislip v. Holland, 401 So.2d 1115, 1117 (Fla. 4th DCA 1981). (emphasis in original).
It would seem almost unnecessary in these times to require proof of the correlation between a person's history of unlawful and violent behavior, drug abuse, and mental illness, and that person's propensity for future dangerousness. Nevertheless, appellee established such a correlation through extensive testimony of police officers, psychologists, and an expert in criminology, Professor White. While it is true, as explained by Professor White, that the *758 science of future behavior has not developed to the point of permitting one to predict the time or exact nature of future acts, the best indicator of potentially-dangerous future conduct is the history of a person's past conduct. The jury could have found, and no doubt did find, that had appellant made reasonable inquiry, it could have learned that Turner had been convicted of a violent battery on his former wife with a knife, had numerous other criminal charges involving violence, and had undergone periods of hospitalization for drug abuse and serious mental illness. As noted, Turner had been convicted for cutting his former wife in the face with a knife. Harrison's testimony at the trial revealed, in what may or may not be regarded as a bizarre coincidence, that the first wound she received from Turner was when he stabbed the knife through her cheek and into her mouth. We think the evidence met the test of causation and foreseeability, sufficient to require resolution by the jury.[6]

V. ACTUAL OR APPARENT AGENCY
In addition to the issues of negligent hiring or retention, the court submitted the case to the jury for consideration of liability grounded upon actual or apparent agency. To recover under a theory of vicarious liability such as actual or apparent agency, it must be shown that the agent or apparent agent's conduct was motivated, at least in part, by the purpose of serving the employer.
It is entirely clear that responsibility for the intentional wrongful acts of a servant-employee may be visited upon his master-employer under the doctrine of respondeat superior only when that conduct in some way furthers the interests of the master or is at least motivated by a purpose to serve those interests, rather than the employee's own.
Perez v. Zazo, 498 So.2d 463, 465 (Fla. 3d DCA 1986) (footnote omitted), citing, among others, Stinson v. Prevatt, 84 Fla. 416, 94 So. 656 (1922); see also, Schwartz v. Zippy Mart, Inc., 470 So.2d 720 (Fla. 1st DCA 1985), overruled on other grounds, Byrd v. Richardson-Greenshields Securities, 552 So.2d 1099 (Fla. 1989); Nazareth v. Herndon Ambulance Service, Inc., 467 So.2d 1076 (Fla. 5th DCA), rev. denied, 478 So.2d 53 (Fla. 1985); Kirschenbaum v. Rehfield, 539 So.2d 12 (Fla. 3d DCA 1989); Morrison Motor Co. v. Manheim Services Corp., 346 So.2d 102 (Fla. 3d DCA 1977), cert. denied, 354 So.2d 983 (Fla. 1978); and Gibbs v. Air Canada, 810 F.2d 1529 (11th Cir.1987).
Restatement (Second) of Agency § 235 (1958) provides that "[an] act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." Further, it was observed in Annot., 34 A.L.R.2d 372, 379 (1954), that "there is general agreement that where an assault is purely personal to the servant, having no real connection with the master's business, the doctrine of respondeat superior is inapplicable to fasten liability upon the master."
There is no evidence that Turner intended to serve Tallahassee Furniture or further any of its interests in any way in his New Year's Day attack upon Harrison. We agree with appellee that the evidence establishes without equivocation that Turner met Harrison through his job-related contact, and but for this initial contact, Turner would not have known anything concerning her residence or that she was single and lived alone, and would have had no means of gaining her confidence so as to obtain access into her apartment. It is clear, however, that Turner had not been instructed by his employer to obtain a receipt for the television set; instead, the request for the receipt was merely a ruse or pretext used by Turner for the purpose of gaining consent to enter Harrison's apartment. Furthermore, Turner's assault on Harrison was so outrageous and so far removed from the nature of his job as a *759 furniture deliveryman that we can conceive of no theory under which his actions can be said to be within the scope of his employment.
We do not hold that an employer can never be held liable for an assault committed by an employee. Rather, we hold only that under the facts of this case, the doctrine of respondeat superior is inapplicable. The cases cited by appellee in support of her theory of liability under this principle are distinguishable by the fact that, in those cases, there was evidence from which it could be concluded that the acts of the agent were in furtherance of his employment in some manner, whereas no such evidence is present in this case.
In M.V. v. Gulf Ridge Council Boy Scouts of America, Inc., 529 So.2d 1248, 1249 (Fla. 2d DCA 1988), the court held a jury issue was presented on the question of liability under the doctrine of respondeat superior in an action for emotional distress suffered by a boy scout subjected to intentional homosexual acts following medically-permitted touching. This created a jury question "of whether the employee's intentional tort was within the scope of his employment with appellee." Id.
The court similarly held in Parsons v. Weinstein Enterprises, Inc., 387 So.2d 1044 (Fla. 3d DCA 1980), that a jury issue was presented where a bar patron was beaten by servants of the bar after the patron broke a light. The court found that a jury could have reasonably concluded from the evidence that at least some of the attackers were employees acting to avenge the damage with the tacit approval of the bar's owner. Also, in Rivas v. Nationwide Personal Security Corp., 559 So.2d 668 (Fla. 3d DCA 1990), the court found that it was error to direct a verdict in favor of a security company whose employee struck a supermarket cashier at the supermarket where the guard was assigned, since the jury could have found that the assault and battery arose out of and was in the course and scope of employment.
Thus, although we agree with appellant that submission of the case to the jury on the theory of actual or apparent agency was error, this error does not require reversal since, as stated in our discussion of the general verdict rendered by the jury, the evidence was sufficient to support the verdict of liability against appellant based upon the theories of negligent hiring or retention.

VI. ADMISSION OF PSYCHIATRIC, CRIMINAL, AND JUVENILE RECORDS
The complaint filed by Harrison alleged that appellant either knew or should have known that on the date of hiring Turner, and during the course of his employment, Turner was incompetent and unfit to work as a deliveryman. This allegation was grounded upon specific allegations pertaining to Turner's record of assault, theft, and probation violation; his attack upon his former wife; his hospital admissions for acute depression, hallucinations, and suicidal thoughts; his history of substance abuse, including alcohol, cocaine, and heroin; and Turner's vicious and violent nature. The allegations were denied by appellant.
Notwithstanding these allegations of the complaint, denied by appellant, appellant argues that the records of Turner's arrests, convictions, and his hospitalization for drug abuse and mental illness were inadmissible. Appellant cites no decision from this or any other jurisdiction denying the admissibility of such records in cases of this kind, in the absence of specific statutory authority precluding their use as evidence. Appellee, on the other hand, points to an abundance of authority holding that such records are admissible to prove the employee's unfitness for employment or retention, and to establish what information the employer would likely have obtained had it made reasonable inquiry. See Williams, 386 So.2d at 1241.
This court in Petrik v. New Hampshire Insurance Company, 379 So.2d 1287, 1289 (Fla. 1st DCA 1979), cert. denied, 400 So.2d 8 (Fla. 1981), recognized the rule as explained in Clooney v. Geeting, 352 So.2d 1216 (Fla. 2d DCA 1977), that an employee's past driving record would be admissible to show negligent hiring or employment *760 of a driver. The decision in Williams, 386 So.2d at 1239, 1240, while not specifically addressing the admissibility of records as proof, leaves no doubt as to the relevancy of information concerning an applicant's criminal or psychiatric treatment, history, and character. Further, the Florida evidence code, Section 90.405(2), Florida Statutes, provides that when character or a particular trait of character of a person is an essential element of a charge, claim, or defense, proof may be made of specific instances of his conduct.
Appellee cites a number of negligent hiring or retention cases from other jurisdictions in which the issue of records admissibility has been addressed. In Estate of Arrington v. Fields, 578 S.W.2d 173 (Tex. Civ.App. 1979),[7] the court stated that a servant's character is an issue and may be proven by evidence of reputation "or of specific conduct" for the purpose of showing that the master knew or by exercising ordinary care should have known of the servant's incompetence. Id. at 179. The employer in Fields objected to the introduction of the employee's prior criminal conviction on several grounds: remoteness (the latest conviction was 13 years prior to trial); unavailability of the records to the employer; admission into evidence would serve no purpose except to prejudice and inflame the jury; and that the prior convictions did not exhibit a propensity to commit acts of violence. The Fields court rejected these arguments, pointing out, among other things, that the evidence in the case, as in the case before us, reflected that the employee's criminal record could have been obtained from at least two sources and that whether the employer should have pursued the inquiries more diligently is a question for the jury, "and does not control its admittance into evidence." 578 S.W.2d at 178.
In Easley v. Apollo Detective Agency, Inc., 69 Ill. App.3d 920, 26 Ill.Dec. 313, 387 N.E.2d 1241 (1979), the court held that there was no error in admitting evidence that an employee had been arrested twice before his employment as a security guard. There, while conceding that unfitness may be shown by specific prior acts of misconduct, the employer, nevertheless, urged that the mere fact of arrest has very little, if any, probative value in showing that the employee has engaged in any misconduct. To this argument the Easley court responded:
Whatever the applicability of that statement in another context, we cannot hold that a person's prior arrests invariably have no relevance to whether he should be hired as a security guard; indeed, the fact that both Apollo representatives testified that they would not have hired Brown had they known of his prior arrests belies such a position.
Id. 26 Ill.Dec. at 323, 387 N.E.2d at 1251. Significantly, the court further pointed out that both the nature and disposition of the arrest charges would have an important bearing on the question of unfitness and on the extent of the employer's misconduct. The court further addressed, and rejected, a contention as to the unavailability of the arrest records to the employer. No issue of unavailability is present in the case before us, with the exception of the juvenile records, because the evidence here established both the availability and insignificant expense involved in obtaining the employee's adult arrest and conviction records from the police, sheriffs' offices, or the Florida Department of Law Enforcement.[8]
We have not overlooked the holding in Florida decisions that there is no requirement, as a matter of law, that the employer check with law enforcement agencies concerning a prospective employee's criminal record. Williams, 386 So.2d at 1240; Garcia v. Duffy, 492 So.2d at 441. As we view it, the rule is not one of admissibility of evidence but, rather, is a rule *761 that specific conduct on the part of the employer, namely, the failure to check with law enforcement agencies concerning criminal records cannot be considered in and of itself, as establishing negligence as a matter of law. The rule does not mean, as apparently argued by appellant, that the duty of reasonable inquiry under no circumstances can be said to encompass an investigation of the criminal record of an employee. Furthermore, the rule itself is not absolute but is conditional or qualified by the following language: "If the employer makes adequate inquiry or otherwise has a sufficient basis to rely on the employee, there is no need to inquire about a possible criminal record." Evans v. Morsell, 284 Md. 160, 395 A.2d 480, 484 (Md. 1978); see also Williams, 386 So.2d at 1240; Garcia, 492 So.2d at 441. The correct application of the rule is seen in Williams, in which, despite the holding that the employer had no duty as a matter of law to check with law enforcement authorities, the fact that the employee had a criminal record, and the employer made no investigation, either by requesting submission of an application form containing questions as to criminal conduct or by interview, required reversal of a summary judgment in favor of the employer and submission of the case to a jury for resolution. A further application of the rule is found in Ponticas, supra. In that case, the court also adopted the Evans v. Morsell rule, stating it as follows: "[i]f the employer has made adequate inquiry or otherwise has a reasonably sufficient basis to conclude the employee is reliable and fit for the job, no affirmative duty rests on him to investigate the possibility that the applicant has a criminal record." 331 N.W.2d at 913. Further, the court explained, "[l]iability of an employer is not to be predicated solely on failure to investigate criminal history of an applicant, but rather, in the totality of the circumstances surrounding the hiring, whether the employer exercised reasonable care. This is generally a jury question." Id. Thus, the court concluded, "the jury could have found that appellants made slight effort to determine whether it was safe to hire [the employee] and give him access to the living quarters of the tenants of the apartments." Id.
We find that the trial court did not err in admitting the evidence of Turner's adult arrest and conviction records. Furthermore, we find that the trial court fully and correctly instructed the jury on the employer's duty with respect to investigation of an employee's criminal records.[9]
We further find appellant's contention that the hospital records pertaining to Turner's psychiatric illness were inadmissible is without merit. Appellant bases its argument upon Section 394.459, Florida Statutes (1985), to the effect that psychiatric and psychological records are confidential and may not be disclosed without a waiver from the patient. Appellant filed a motion in limine seeking a ruling from the trial court excluding these psychiatric records. The trial court granted the motion in limine based upon the records' confidentiality under the statute, subject to a showing that the records were properly obtained. At the trial, it was disclosed that Turner had signed a release with respect to these records, and they were obtained by Dr. Stimel, a psychologist who examined Turner shortly after his arrest for the attack on Harrison. We find no error in the trial court's admission of these records.
Appellant makes much the same argument as was made in the Easley case *762 above, to the effect that the records were not available to the employer. As demonstrated by Dr. Stimel, they were available by the simple means of obtaining a release from Turner. As previously noted, appellant's standard application form had questions relating to nervous conditions or mental disorders. Appellant failed to require an application form to be filled out and conducted no interview with Turner concerning his past medical history. Since the records were obtainable with Turner's consent, they were not necessarily unavailable to the employer.
We do not agree with appellant's contention that in order for the records to be admissible, it must first be shown that Turner would have signed a written release.[10] In a similar vein, the Williams court noted that some courts hold the employer chargeable with knowledge it could have obtained upon reasonable investigation, while others seem to hold that an employer is only responsible for his actual prior knowledge. We agree, as stated by the Williams court, that the latter view "appears to put a premium upon failing to make any inquiry whatsoever." 386 So.2d at 1240. To adopt the argument made by appellant would serve to insulate the employer from liability so long as he made no inquiry and had no actual knowledge concerning an employee's mental instability. We decline to adopt such a rule. As stated in Ponticas, 331 N.W.2d at 912-913 although an employer will not be liable for failure to discover information that could have been discovered by reasonable investigation, the issue is whether the employer did make a reasonable investigation.
Turning to the matter of Turner's juvenile records, a different question is presented. Juvenile offense files are protected from disclosure and use as evidence by statute. Section 39.12(5) and (7), F.S. Record of Turner's two 1976 juvenile offenses for burglary and strong-arm robbery were noted in a "rap" sheet of the Florida Department of Law Enforcement which was attached to a 1979 court file in an adjoining county pertaining to criminal charges brought against Turner for an attack on his former wife. As noted by appellant, the records of Turner's juvenile arrests were sealed by court order; the only way they could have become a part of the court file in the adult case was by mistake. The trial court ruled, nevertheless, that in view of the fact that the rap sheet appeared as a part of the public records, open to inspection by any person, it became a matter of public information and could be introduced into evidence.
We agree that an employer should not be held responsible for information contained in records of juvenile arrests or dispositions which are confidential and under court seal. However, even if it be assumed that the trial court abused its discretion in allowing the jury to have access to the rap sheet disclosing Turner's juvenile records, we are of the opinion that the error was harmless. While the arrests for armed robbery and burglary indicate a propensity for unlawful conduct, Turner had other arrests as an adult and a conviction of a serious charge involving violence to the person of another, namely, the knife attack on his former wife. In view of the extent of the other evidence disclosing Turner's unfitness for employment or retention, we are of the view that the disclosure of his juvenile arrests was cumulative and could not have had any bearing on the outcome of this case. We therefore conclude that any error in the admission of the juvenile records was harmless.
Turning to another alleged trial error, appellant argues that the testimony given by appellee's expert, Professor White, concerning Turner's potential for danger given his history prior to the attack on Harrison was improper and inadmissible. Appellant maintains that the subject matter of Professor White's testimony was not beyond the understanding of the average layman and thus cannot be the subject of expert testimony, citing Sea Fresh Frozen *763 Products, Inc. v. Abdin, 411 So.2d 218, 219 (Fla. 5th DCA), rev. denied, 419 So.2d 1195 (Fla. 1982); Florida Power Corp. v. Barron, 481 So.2d 1309, 1310 (Fla. 2d DCA), rev. denied, 488 So.2d 829 (Fla. 1986). Additionally, appellant maintains that Professor White possessed no level of experience or learning that qualified him to render such an opinion.
These contentions are without merit. Trial courts are vested with "broad discretion" in deciding the matters which may be the subject of expert opinion evidence, and absent a clear showing of error, a ruling on such a matter will not be overturned on appeal. Johnson v. State, 393 So.2d 1069, 1072 (Fla. 1981), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191, reh. denied, 454 U.S. 1093, 102 S.Ct. 660, 70 L.Ed.2d 632 (1981). We find ample basis in the record for the trial court's ruling that Professor White was qualified as an expert in the fields of public and private security, and in the fields of criminal law about which he testified. Moreover, Professor White's qualifications as an expert in the fields of public and private security, and criminology were never objected to or questioned by appellant. The court sustained appellant's objection, based upon White's lack of qualifications as an expert in the prediction of future violent behavior, to the question of whether Turner, in view of his past history, "was a danger to people." However, on further questioning, Professor White was permitted to explain the factors involved and the criteria used in determining the risk or potential for future dangerous behavior. We find that the evidence fully supports Professor White's expertise and qualifications in the matters about which he testified.[11]
Appellant objected to Professor White's testimony concerning the "iceberg effect." In answer to a specific question on direct examination, Professor White explained that the so-called "iceberg effect" referred to statistics compiled by the United States Department of Justice indicating that reported criminal incidents probably reflect only about one-third of the total crimes actually committed. Upon objection for irrelevancy, the court ruled the answer admissible "as long as it does not relate to Mr. Turner." Continuing with his explanation, Professor White explained that a number of crimes go unreported either because victims do not wish to become involved, are frightened, or simply cannot identify their assailant, etc. We agree that, standing alone, the testimony concerning the "iceberg effect" seems to have little bearing upon the issues in the case, since under the court's ruling, it clearly could not be applied to Turner. However, we cannot view this testimony in isolation but must consider it in connection with all the other testimony given by Professor White. In so doing, we think this testimony was related, however ephemerally, to other testimony given by Professor White, without objection, concerning the significance of arrest and conviction information on reasonable employment and hiring practices for jobs in which the risk of harm to customers or the public is a consideration. Furthermore, we find that this testimony encompassed less than one page of some 150 pages of testimony by Professor White, the majority of which was cross-examination.

VII. PUNITIVE DAMAGES
Without further recitation of the egregious facts of this case, we are of the *764 view that the trial court did not err in allowing the jury to consider punitive damages. Based upon the information appellant knew or reasonably should have discovered about Turner, the jury could reasonably have determined that appellant's conduct in hiring or retaining Turner was so gross and flagrant as to show a reckless disregard of human life or of the safety of persons exposed to the effect of its conduct; or that its conduct so entirely lacked any care that the appellant must have been consciously indifferent to the consequences; or that appellant's conduct shows wantonness or recklessness, or a grossly-careless disregard of the safety and welfare of the public; or such conduct showed a reckless indifference to the rights of others which is equivalent to an intentional violation of those rights. See American Cyanamid Co. v. Roy, 498 So.2d 859 (Fla. 1986); Como Oil Company, Inc. v. O'Loughlin, 466 So.2d 1061 (Fla. 1985); White Construction Co. v. Dupont, 455 So.2d 1026, 1029 (Fla. 1984); Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242 (Fla. 1st DCA 1984), rev. denied, 467 So.2d 999 (Fla. 1985).
Since Turner's attack on Harrison occurred outside the scope of his employment, appellant could not be held vicariously liable for Turner's acts. Mercury Motors Express, Inc. v. Smith, 393 So.2d 545 (Fla. 1981). However, as appellant's argument tacitly concedes, appellant may be held liable for its own acts which rise to a level of extreme misconduct within the standard adopted by the court in White Construction v. Dupont, supra. We have examined appellant's argument addressing its liability under this standard and find that it is based entirely upon appellant's version of the facts, which differs substantially from the facts the jury could reasonably have found from all the evidence.

CONCLUSION
Appellant urges, referring to the voluminous evidence of Turner's unfitness gathered by police, prosecutors, medical personnel, and plaintiff's attorneys, that "twenty/twenty hindsight" so refocused the trial on Turner's bad character that it became impossible for the jury to have made a rational judgment about Tallahassee Furniture's legal obligations in 1985. We disagree. After careful review of the record, we find nothing to indicate that at the conclusion of this six-day trial the jury was not thoroughly conversant with the issues, the evidence, and the law they had to apply in order to reach a decision. We find that the areas of actual evidentiary conflict on the controlling facts were remarkably limited for a trial of this duration, and that these areas of dispute, as well as the issues of law involved, were fully and fairly discussed by counsel in their closing arguments to the jury. That reasonable persons might disagree with the jury's verdict does not authorize this court to set it aside.[12]
The judgment appealed is AFFIRMED.
ALLEN, J., concurs.
NIMMONS, J., concurs and dissents in part with written opinion.
NIMMONS, Judge, concurring in part and dissenting in part.
With the following exceptions, I concur in Judge Smith's opinion.
I am of the view that Professor White's testimony concerning the "iceberg effect" (with respect to criminal history records) was inadmissible. However, I do not believe the error in admitting this testimony rose to the level of being reversible. Rather, I would deem it harmless when viewed in the context of all of the evidence presented.
With respect to the punitive damages issue, I do not believe that the appellant's conduct in its hiring and retaining of Turner *765 met the standard of extreme misconduct contemplated by White Construction Co. v. Dupont, 455 So.2d 1026, 1029 (Fla. 1984).
NOTES
[1] The employee claimed that he entered through a back door he found ajar; the plaintiff contended that he used a passkey.
[2] Turner had been transported from prison to the scene of the trial in this case and was being held to be available as a witness if called. Neither appellant nor appellee placed Turner on the witness stand.
[3] It was also established, significantly, that Turner was in the vicinity of Harrison's apartment on another occasion when he made a furniture delivery to the same apartment complex during the week preceding the New Year's Day attack.
[4] Turner was wearing his brown uniform pants when arrested shortly after the attack. A bloody shirt found in his home contained fibers matching those from Harrison's clothing. The blood pattern on the shirt was consistent with being worn under another garment, open in front. Turner's brown uniform jacket, which was customarily worn on cool days, was never found by the police, nor was the knife used in the attack.
[5] Turner went to the home of a coemployee on the night before and falsely told the employee's wife that Turner's van needed repairs and that he needed the unmarked truck to drive to a neighboring town to check on his ailing mother. Harrison did not see the truck Turner drove to the apartment at the time of the attack. After the attack, Turner arrived back at the scene driving the marked van. Police investigators were unable to find blood stains in the unmarked truck, but other evidence indicated it was the vehicle used for travel to and from the crime scene.
[6] As a practical matter, argument on the foreseeability issue would appear to be foreclosed to some extent by the testimony of appellant's own witnesses to the effect that if they had known the aspects of Turner's background and character described in this opinion, they would not have hired him as a deliveryman.
[7] Cited in Williams, 386 So.2d at 1240.
[8] Of further significance is the fact that the Easley court, in rejecting the contention made in oral argument that it is an unfair labor practice under Illinois law to include a question on an application form as to prior arrests, observed that no case law cited by the employer provides that arrests discovered by other means cannot be considered. 26 Ill.Dec. at 323, 387 N.E.2d at 1251.
[9] The court instructed the jury, in part:

However, there is no requirement in every case that the employer make an inquiry with law enforcement agencies about an employee's possible criminal record. Even where the employee is to regularly deal with the public [sic].
If the employer makes adequate inquiry or otherwise has sufficient basis to rely on the employee there is no need to inquire about the possible criminal record. Even actual knowledge of an employee's criminal record does not establish in every case the employer's negligence in hiring him.
The law does not require that an employer can never hire a person with a criminal record at the risk of being held liable for the employee's torturous act, however each case must be determined on its own circumstances.
Rehabilitation of those who have gone astray can be a goal of society.
[10] The most obvious response to a refusal to sign a release, as explained by Professor White, would be for the employer to refuse to hire the employee in a position in which the employee's mental condition could present a threat to customers.
[11] Professor White is an associate Professor of Criminology at Florida State University. He has a B.S. degree in criminology. His experience includes work both as a city policeman and sheriff's department detective sergeant; he received a law degree and worked as a prosecuting attorney, handling felony career and Baker act commitment proceedings for the mentally ill; served as special prosecutor, Governor's Council for Prosecution of Organized Crime; assistant general counsel for Law Enforcement Affairs, Office of the Governor; member of the White House Conference on Legal Rights and Justice Task Force; he has published a book dealing with the insanity defense, and training papers and materials for police training academies and junior colleges and universities in the field of high hazard police operations  the use of deadly force; he was currently teaching in the area of public and private security, and in police operations, and had acted as consultant and conducted background investigations for employers in both the public and private sector.
[12] We have not specifically addressed matters cursorily raised in appellant's brief, such as the complaint that the court erroneously instructed the jury, and that the damages were excessive. The brief does not point out the instructions that are deemed improper nor the specific errors therein. The claim as to excessiveness of damages is without merit. These and other matters have not been briefed and argued so as to merit further discussion.