BENTON, Judge,
dissenting.
In granting the motion for judgment in accordance with defendant’s motion for directed verdict, the trial judge ruled that the jury had no basis for concluding, as it did, that Blaze Shield (to which Ms. Wiley was concededly[1] exposed) contained respirable free crystalline silica at the time it left the possession of United States Mineral Products Company (U.S. Mineral). In my opinion, the evidence was sufficient to permit the jury to infer that Blaze Shield samples, which came in evidence without objection, had not been contaminated in a material way before they were examined by the only chemist who performed appropriate tests. That chemist’s testimony unequivocally supports the jury’s verdict, insofar as it found that Blaze Shield contained respirable free crystalline silica.
No evidence supports the conjecture that free crystalline silica found in Blaze Shield samples was added after the samples left the manufacturer. Nothing in the record remotely suggests that Ms. Wiley in any way intentionally contaminated anything. She began by requesting that U.S. Mineral produce a sample of Blaze Shield for testing. But U.S. Mineral objected to the request to produce as irrelevant. The request to produce asked for a
sample of the U.S. Mineral Products Company’s product, Blaze Shield D C/F, or sample of such other product or products sold, provided or delivered for use by defendant, Spray Insulation, Inc. at the Trident Kings Bay project prior to the alleged injury sued herein.
U.S. Mineral responded to the request to produce:
This request seeks irrelevant material. Plaintiff has access to the actual product to which she was allegedly exposed[2] and any examination, testing or analysis on a sample could be performed on the actual product.
Rather than move to compel production, Ms. Wiley, who by then no longer worked at the Trident Kings Bay site, enlisted a friend’s assistance in obtaining Blaze Shield from the job site.[3] A second sample came from the welding bag Ms. Wiley wore while working on the job.
*1090 The trial court’s order obliquely suggests that there was some question whether “the material produced by the plaintiff was Blaze Shield.” On direct examination, Wiley testified, without objection, that the product she worked with at the Trident Building was Blaze Shield, and that the sample her ftiend Smith brought her was the same type of product she was working around.[4] Wiley identified, again without any objection, the bag that the second sample was taken from as the welding bag she used at the Trident job.[5] Examining these samples, a chemist found “calcium silicates and other silicates and mineral wool,” admitted constituents of Blaze Shield. The jury was fully entitled to conclude that the samples, which came in evidence -without objection, were Blaze Shield. On this record, it would have been surprising if the jury had decided to the contrary.

Plaintiff’s Evidence

When, in October of 1986, Wiley brought the Blaze Shield bag to a chemist, she asked him to cheek for asbestos, afraid she was suffering from asbestosis. The chemist— Newton, the same one who testified at trial— found no asbestos and so informed her, ending any hope for recovering damages under the only theory she then had about the etiology of her condition. Only later[6] did Newton test for respirable free silica. Newton analyzed the samples using polarized light *1091 microscopy,[7] and concluded that the samples taken from the welding bag[8] and the Blaze Shield bag all contained respirable free crystalline silica. He attributed all the samples to a common source.[9]

Defendant’s Evidence

For its part, U.S. Mineral did not introduce a single sample of Blaze Shield into evidenee. U.S. Mineral’s only expert — also a chemist, Fussaro — admitted, “I cannot determine for sure whether there is any silica.” Fussaro’s ignorance about free crystalline silica in Blaze Shield was an inevitable consequence of the severely limited inquiry he undertook.[10] X-ray diffraction on a bulk *1092 sample was the only technique he used.[11] In no way did he contradict a single one of Newton’s findings.
On cross examination, Fussaro admitted that free crystalline silica could have comprised up to three percent of the Blaze Shield samples he tested.
Q. Okay. So there could have been up to one percent of quartz in the sample also and come out as a nondetection.
A. Yes.
Q. And as well as there could have been up to one percent of quartz and up to two percent of cristobalite, therefore, up to almost three percent of free crystalline silica of those two categories and be nondeteet-ed?
A. Yes.
In fact, to the extent Blaze Shield contains silica other than quartz or cristobalite, the test Fussaro performed did not rule out the possibility that the percentage of respirable free crystalline silica could have been still higher.

Jury’s Verdict

The jury that heard the evidence decided in Ms. Wiley’s favor. Their verdict should not lightly be set aside.
*1093 Granting a motion for directed verdict is “proper only if there was no evidence upon which a jury could find,” Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 654 So.2d 911, 914 (Fla.1995), against the party for whom the verdict is directed.
It is appropriate to direct a verdict for the defendant only when the evidence considered in its entirety and the reasonable inferences to be drawn therefrom fail to prove the plaintiffs case under the issues made by the pleadings. Golden v. Morris, Fla.1951, 55 So.2d 714.
Hartnett v. Fowler, 94 So.2d 724, 725 (Fla.1957).
[A] party who moves for a directed verdict admits for the purpose of testing the motion the facts in evidence and in addition admits every reasonable and proper conclusion based thereon which is favorable to the adverse party. Dempsey-Vanderbilt Hotel v. Huisman, 153 Fla. 800, 15 So.2d 903 [1943],

Id.

White v. City of Waldo, 659 So.2d 707 (Fla. 1st DCA 1995). The majority acknowledges the standard of review we should apply in reviewing the trial court’s order granting defendant’s motion for judgment in accordance with defendant’s motion for directed verdict.
In reviewing the propriety of the trial court’s directed verdict, this court must review the facts and inferences to be drawn in a light most favorable to appellant, the nonmoving party.... The directed verdict can only be upheld if there is no evidence or reasonable inference which would support a jury verdict in appellant’s favor.
Jones v. Heil Co., 566 So.2d 565 (Fla. 1st DCA 1990). Correct application of this standard would necessitate reversal of the order granting the motion for judgment in accordance with defendant’s motion for directed verdict.
Expert testimony gave the jury ample basis to find that the Blaze Shield Ms. Wiley worked around contained respirable silica like the particles found in a biopsy of her lung. According to undisputed testimony, the practice was to mix the manufacturer’s powder with a like amount of water (and nothing else) for application to the steel. As far as the evidence showed, the water contained no free crystalline silica, nor has there been any contention that it did.
The sample retrieved from the pouch of Ms. Wiley’s welder’s bag or apron was dust generated in scraping Blaze Shield off steel she was to weld. (The mixture had dried by the time she undertook its removal.) Testing of that sample and of what came in the Blaze Shield bag her friend brought from the site revealed no pertinent differences. This evidence cannot be said to have eliminated with scientific certainty the hypothesis of environmental contamination (from some unspecified source). But, together with unobjeeted to expert testimony that all the samples came from a common source, it was an adequate basis for the jury’s conclusion that the common source was what the manufacturer shipped. The directed verdict should be reversed and the case should be remanded to the trial court for further proceedings.

. For purposes of defendant's motion for judgment in accordance with defendant’s motion for directed verdict, U.S. Mineral did not dispute that Wiley was exposed to Blaze Shield. At the proceedings held on post-trial motions, defense counsel stated:
I don’t disagree with anything he has said. The plaintiff says she was exposed to Blaze Shield.
[[Image here]]
In Janet Wiley’s case she has gone the step of being the plaintiff who comes in and says, I saw them spraying CAFCO. I saw them spraying it on the beams and I chipped it off. We don’t dispute that for purposes of the motions for judgment in accordance with the motions for directed verdict.

. Mr. Verhalen, the chairman of the board of U.S. Mineral, testified that an individual could not obtain a bag of Blaze Shield on the open market.
Q. If a person wanted to, an individual wanted to go buy a bag of Blaze Shield or any of the fireproofing products that U.S. Mineral made, could they do that over the counter or at a hardware store, or anything like that?
A. No. Our sales were only made direct to licensed contractors.

. On cross examination, defense counsel elicited the following from Wiley:
Q. Now you told us that shortly after you were terminated in '86, you got a sample of some, what you call some Blaze Shield from a friend of yours; is that correct?
A. Fireproofing, yes, sir.
[[Image here]]
*1090 Q. What did you do, call him up and tell him to get some of that stuff?
A. No. I met him after work one day, and I asked him, I said, I need to get a sample to find out what I've been working around because of the dust.
Q. So you got it from Mr. Smith sometime after that meeting that you had with him?
A. About two weeks after that, yes.
Q. And you have no idea where Mr. Smith got it from?
A. He got it off the Tri-dent [sic] Building. He told me he did.
Although Wiley's statement that Smith told her he got the sample from the Trident building was hearsay, “hearsay evidence not objected to becomes part of the evidence in the case and is usable as proof just as any other evidence, limited only by its rational, persuasive power.” Tallahassee Furniture Co., Inc. v. Harrison, 583 So.2d 744, 754 (Fla. 1st DCA 1991), review denied, 595 So.2d 558 (Fla.1992), citing Tri-State Systems, Inc. v. Department of Transp., 500 So.2d 212, 215 (Fla. 1st DCA 1986), review denied, 506 So.2d 1041 (Fla.1987).

.Q. You know the name of the product that you were working on?
A. Blaze Shield.
Q. How do you know that's the name of the product?
A. That's what was written on the bags.
Q. How many bags were — I mean we are talking about how many bags were you around up there?
A. They had them stacked up.
Q. Hundreds?
A. Probably.
Q. ... Tell the jury what this is.
A. That's the bag the fireproofing was in.
Q. How did you come to obtain this bag?
A. I had a friend bring it off the jobsite after I was terminated. I was not — they pulled my badge. I was no longer allowed to go on the base, so I met him after work and I asked him to get me a bag.
Q. Is this the same type of bag as the other type bags you saw on the base?
A. Yes, it is.
Q. And to your knowledge, this is the same type product you were working in and around?
A. Yes, it is.
MR. MATTHEWS: I have no objection.

. Q. Did you have this bag? Is this the bag you used at the Tri-dent [sic] job?
A. Yes, it is.
Q. You wore this bag while you were working there?
A. Yes, I did.
Q. While I’m on the subject, did you eventually give this bag to Mr. Newton?
A. Yes, I did.
MR. COPELAND: Mark it; any objection?
MR. MATTHEWS: No.

. Newton testified as follows:
Q. ... Did you test the sample that you pulled from the CAFCO [Blaze Shield] bag with the original sample that you had?
A. Originally from the very first sample that came out, I checked for asbestos. I was not looking for free silica. When Ms. Wiley called back a few weeks later, I went back and looked at it looking for free silicates.
Q. Did you find any?
A. Yes.
Q. Did you test it with the sample from this bag?
A. Yes, sir.
Q. And that's the sample that you had pulled from this bag subsequently?
A. Correct.
Q. And how did those two samples compare?
A. They were the same.
Q. That is your opinion within a reasonable degree of probability?
*1091 A. Yes, sir. Again, in the microscope you look at the percentage of all of the constituents based in each other and in the manufacturers' mix they keep it pretty close percentagewise so you can tell if it is the same material.

. On direct examination, Newton explained this method of testing for free crystalline silica.
Polarized light microscopy, it's to look at micronized particles, very, very small particles. And it bends the light to where it is all going in the same direction.
And as the light passes through the crystals and the fibers, they can be warped in the fluid to give certain colors. An example would be if you took a rainbow, the refractive index of the air outside is one. So if you have water vapor in the air and sunshine, you always get the exact same colors of the rainbow. So certain particles will always glow the exact same color in a certain fluid....
If you have got two forms of silica under the microscope — if you have got Si02 say in the form of glass wool or like in a drinking glass, it would appear invisible. You can see the outlines of it but you can see through it.
If you have got a free-crystalline silica product in a 1.55 fluid, then it will glow certain colors, usually gold and blue in different orientations because the crystal has two crystal faces like a diamond. So as you rotate that crystal, it will alternate blue and then gold and it will be translucent in the nonvisible.

. Although some cotton and wood fibers found their way into the welding bag, this did not adversely affect the chemical analysis, according to the analyst. Newton testified that he was able to get a sufficient sample of the Blaze Shield and that he was able to determine that it came from the same source as the initial sample:
Q. The sample that you had pulled from the welding bag, what materials do you recall it having in it?
A. The welding bag had the same materials as the previous sample submitted under the Blaze Shield name. It had the glass fibers, the silicates, the calcium silicates and some of the free silicates. There were also present wood chips and other detritus things that you would expect to find that had fallen into the bag, some cotton fibers and wooden fibers and things like that line.
Q. But you were able to delineate a sufficient sample of Blaze Shield or the dust to determine it was the same as the Blaze Shield product?
A. Yes, sir.
Q. And that is within a reasonable degree of probability?
A. Yes, sir.

. Newton testified:
Q. So, can you say from the sample that you pulled from the Blaze Shield bag whether there are free respirable crystalline silica particles?
A. That would be correct.... This is also another example, the Blaze Shield bag itself. I wanted to get a couple of them to show the product. This one, we are seeing the same thing as far as the respirable silica. There are a bit larger crystals and you can get a better idea of how the glass fibers look.
[[Image here]]
Q. Mr. Newton, take the look at all of the particles. Do you have an opinion as to whether the particles are the same material as you have tested previously from the CAFCO [Blaze Shield] bag?
A. If you look at the percentage relationships of the free silica in the bag and the free silica in the CAFCO [Blaze Shield] bag and the silica that is present in the microscope slides, you have got the same percentage of calcium silicates and sulfates to the silicate. So I would say they came from the same origination point.
Q. Is that opinion within a reasonable degree of probability?
A. Yes, sir.

. Newton testified concerning the preferred method of testing for free crystalline silica and gave his opinion on the sufficiency of the 1970 and 1984 tests performed by Fussaro.
Q. Do you have an opinion as to whether there is a more appropriate method for testing done at that time for the determination of free silica content?
A. If you wanted to check for the respirable silica in those compounds, what should have been used, x-ray diffraction could have been used but all of the standards are written for airs and also—
Q. Excuse me. For airs?
A. Correct.
Q. Air sampling?
A. Correct. And there is also an approved sample for bulks, but only the respirable frac *1092 tion. So if you have a bulk sample like this, you have to be manipulating the material and have it airborne and sample just the respirable fraction, ten microns or less, and test that.
If you test using the large — the large particles, dilute it and you get an inaccurate reading. You get too many background interference and the baseline is too high and you can't see the silica that is present.
Q. How about the number of tests themselves, the test that has been submitted from 1970 and the test from 1984? Do you have an opinion? If so, upon what basis whether that quantity of testing is sufficient?
A. Okay. In the 1970 test study, the analysis they did on the air sample was measuring millions of particles per cubic foot. All of the threshold limit values issued by the government are milligrams per cubic feet and so those aren’t of much use.
The 1984 report, they do list it as ten milligrams of quartz per milligram of sample which is equivalent of one percent. However, they only tested the CAFCO Blaze Shield that I can see one time. And if you are looking at the materials such as this when they’re manufacturing the glass wool and the other constituents from slag or they are mining the minerals from other areas those mines or slags can change on a continuous basis.
So one sample can’t give you a cross section of what is going on over a period of years as the product is manufactured. And generally in analytical chemistry, you would collect a sample ten times and then throw out your highest and lowest average to get a good result.
So one sample is pretty, pretty weak. I would probably have checked it more than that.

. On cross examination Fussaro acknowledged that although they tried to adhere as closely as possible to approved NIOSH (National Institute for Safety and Health Administration) methods, the test they performed was a modification of the approved method because the NIOSH-approved method is intended for air samples. Fussaro also admitted that air sampling gives a better indication of respirable particles.
Q. Now, let's discuss for a minute about the air sampling versus bulk sampling. Isn't it true in air sampling when you produce an air sample, the heavier particles will fall out? That gives you a better indication of respirable particles.
A. Well, if you are taking a respirable sample, the filters collection apparatus does eliminate any heavier particles. It does this by centrifu-gation. It will spin out the heavier particles and what is deposited on the filter will be the respirable size particles.
Q. That is in the air sample?
A. In the air sample.
Q. Was that done in your procedure?
A. No, because we were dealing with bulk samples.
Q. So in your procedure you didn’t spin out the heavier products; is that correct?
A. That's correct. That's right.
Q. Then wouldn’t air sampling give you a better indication of the free silica content of respirable dusts?
A. It is a means to determine the respirable weight of silica.
Q. To get rid of the heavier products. Isn't the air sampling better — an indication of the respirable dust that will remain?
A. It will provide the respirable size particles of dust on the filter and then anything we do find will be considered of respirable size but—
Q. But you didn't do that kind of procedure.
A. No.
Finally, Fussaro admitted on recross examination that no regulatory agency had approved the method he used to test a bulk sample for free crystalline silica.
Q. Doctor, did anyone approve the P & CAM 109 adaptation method that y'all used for bulk sampling of this free crystalline silica?
A. Did anyone — you mean a regulatory agency?
Q. Yes.
A No. There is none to this day.